## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JAMES KISTLER and LISA LANG, individually and as representatives of a class of similarly situated persons, on behalf of the STANLEY BLACK & DECKER RETIREMENT ACCOUNT PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>STANLEY BLACK & DECKER, INC.,<br><br>Defendant. | Case No.: 3:22-cv-00966-SRU<br><br><br>**AMENDED CLASS ACTION COMPLAINT** |

## I.     INTRODUCTION

1.      Plaintiffs, James Kistler ("Kistler") and Lisa Lang ("Lang") (collectively, "Plaintiffs"), individually in their capacity as participants of the Stanley Black & Decker Retirement Account Plan ("Plan"), bring this action ("Action") under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants and beneficiaries of the Plan, against Defendant, Stanley Black & Decker, Inc. ("Stanley Black & Decker"), for breach of its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and related breaches of applicable law beginning six years from the date the initial complaint originating this Action was filed and continuing to the date of judgment, or such other date the Court determines is appropriate and just ("Class Period").

2.      As employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit, defined contribution plans (*e.g.*, 401(k) and 401(a) plans) qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional

defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, the participants in defined contribution plans bear the risk of high fees and investment underperformance.

3.      As of December 31, 2020, the Plan had 20,603 participants with account balances and assets totaling approximately $2.18 billion, placing it in the top 0.1% of all defined contribution plans by plan size.[1]  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and can demand low-cost plan administration and investment management services within the marketplace.  The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

4.      Defendant maintains the Plan and is responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendant is a fiduciary under ERISA, and, as such, owes specific duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, select and maintain prudent and diverse investment options to offer through the Plan, and ensure that Plan expenses are fair and reasonable in relation to the services obtained. These fiduciary duties are well understood to be the "highest known to law." *Donovan v. Bierwirth*, 680 F.3d 263, 272 n.8 (2d Cir. 1982).

5.      Defendant has breached its fiduciary duties to the Plan.  As detailed below, Defendant (1) allowed unreasonable expenses to be charged to participants; and (2) selected,

---

[1]Brightscope & Investment Company Inst., *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018* (July 2021), https://www.ici.org/files/2021/21_ppr_dcplan_profile_401k.pdf.

retained, and/or otherwise ratified unsuitable investments instead of offering prudent alternative investments that were readily available at all times Defendant selected and retained the funds at issue and throughout the Class Period.  Since Defendant has discretion to select the investments made available to participants, Defendant's breaches are the direct cause of the losses alleged herein.

6.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under the circumstances.

7.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

   i.      A declaratory judgment holding that the acts of Defendant described herein violate ERISA and applicable law;

   ii.     Equitable, legal or remedial relief for all losses and/or compensatory damages;

   iii.    Attorneys' fees, costs and other recoverable expenses of litigation; and

   iv.     Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    THE PARTIES

8.      Kistler is a former employee of Stanley Black & Decker and former participant in the Plan under 29 U.S.C. § 1002(7).  Kistler is a resident of Schnecksville, Pennsylvania.  During the Class Period, Kistler maintained an investment through the Plan in the BlackRock LifePath Index 2030 Fund, the Stanley Black & Decker Stock Fund, the Mellon S&P 500 Index Fund, the

- 3 -

SSgA Global Equity Index Fund, and the SSgA U.S. Extended Market Equity Index Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

9.     Lang is a former employee of Stanley Black & Decker and former participant in the Plan under 29 U.S.C. § 1002(7).  Lang is a resident of Sardinia, Ohio.  During the Class Period, Lang maintained an investment through the Plan in the BlackRock LifePath Index 2030 Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

10.     Stanley Black & Decker, a public Connecticut corporation headquartered in New Britain, Connecticut , is a manufacturer of industrial tools and household hardware and provider of security products.  Pursuant to the parties' Stipulation dated November 4, 2022 (Dkt. No. 36), Stanley Black & Decker has agreed to be legally responsible for the conduct of the Board (defined below), the individual members of the Board who served at any time from July 29, 2016 to the present, the Committee (defined below), and the individual members of the Committee who served at any time from July 29, 2016 to the present.  Stanley Black & Decker further agreed to satisfy any judgment based on the actions or omissions of the fiduciaries responsible for overseeing the Plan and/or individuals or entities responsible for appointing and monitoring those fiduciaries, including the Board and the Committee and their members.  For purposes of convenience, Stanely Black & Decker, the Board, the Committee and the members of the Board and the Committee between July 29, 2016 and the present are collectively and individually referred to herein as "Defendant."

11.     The Board of Directors of Stanley Black & Decker, Inc. ("Board") appointed "authorized representatives" of Stanley Black & Decker, including the Administrative Committee (defined below), as plan fiduciaries.  The Board and its individual members were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because each

exercised discretionary authority to appoint and/or monitor the Administrative Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

12.     The Stanley Black & Decker, Inc. Pension Operating Committee ("Committee" or "Administrative Committee") and its individual members are responsible for the general administration of the Plan and each are fiduciaries under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Committee maintains its address at Stanley Black & Decker's corporate headquarters in New Britain, Connecticut.  The Administrative Committee and its members are appointed by Stanley Black & Decker or its delegate to administer the Plan on Stanley Black & Decker's behalf.

### III.     JURISDICTION AND VENUE

13.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

14.     This Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. § 1331 because the Action arises under the laws of the United States.

15.     Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Stanley Black & Decker's principal place of business is in this District and the Plan is administered from this judicial district.  Further, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

16.     Plaintiffs have standing to bring the Action because they maintained investments in the Plan in the investment options challenged in the Action during the Class Period.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary, or the

Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendant's fiduciary breaches and remains vulnerable to continuing harm, all redressable by the Court.  In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## IV.    FACTUAL ALLEGATIONS

### A.    Background and Plan Structure

17.    The Plan is a participant-directed defined contribution plan, meaning participants direct the investment of their contributions into various investment options offered by the Plan. Each participant's account is credited with their participant contributions, applicable employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The investment options made available to Plan participants include various mutual funds, collective trust funds, and the Stanley Black & Decker Stock Fund.

18.    Mutual funds are publicly traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation and are required to provide

certain investment and financial disclosures and information in the form of a prospectus.

19.    Collective trusts are, in essence, mutual funds without the SEC regulation. Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds described above.  Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan.  Despite their historic lack of transparency, modern collective trust sponsors provide sufficient information for investors to make informed decisions about the merits of investing in collective trusts.  The main advantage of opting for a collective trust rather than a mutual fund is the negotiability of the fees.  Accordingly, larger retirement plans should be able to leverage their size for lower fees.

20.    The Stanley Black & Decker Stock Fund is a unitized trust fund which primarily invests in shares of Stanley Black & Decker common stock, as well as in short-term investments to provide for the Stock Fund's liquidity needs.

21.    From the start of the Class Period through May 24, 2021, Plan assets were held in a trust by the Plan trustee, Wells Fargo Bank, National Association ("Wells Fargo").  Effective May 25, 2021, Principal Financial Group became the Plan trustee.  All investments and asset allocations are and were performed through these trust instruments.

22.    Throughout the Class Period, Defendant maintained an Investment Policy Statement ("IPS"), as amended from time to time, containing guidelines for the selection, evaluation, and monitoring of Plan investment options.  The consistent application of the guidelines in an IPS is a vital component of a prudent investment selection and monitoring

process.  When employed properly, IPS guidelines ensure that retirement plan investments are assessed in a replicable manner.

23.    When plan fiduciaries adopt an IPS, it becomes a binding plan document.[2]  In addition, prevailing industry standards dictate that plan fiduciaries should familiarize themselves with an operative IPS, rely on the operative IPS in the course of monitoring a plan's investments, and not violate the guidance set forth in the IPS.

24.    At all relevant times, the Plan's IPS prescribed that the Committee evaluate, among other criteria, the returns and risk-adjusted returns of Plan investments relative to an appropriate market index and a relevant peer group of similar funds.

**B.    Target Date Funds**

25.    A target date fund ("TDF") is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  TDFs offer investors dynamic, straightforward asset allocation, while providing both long-term growth and capital preservation. TDF suites comprise a collection of different "vintages" for a range of target retirement years, typically in five- or ten-year intervals.  At any point in time, each distinct vintage offers a different asset allocation of the same portfolio of underlying funds.  All TDFs are inherently actively managed, because managers make changes to the allocations to stocks, bonds, and cash over time.  These allocation shifts are referred to as a fund's glide path.

26.    TDF glide paths are managed either "to" or "through" retirement.  A "to retirement" glide path generally assumes participants will withdraw their funds once they reach

---

[2]*See* Fred Reish & Joan Nerl, An IPS 'Sets' The Standard: Once adopted, the document must be followed, PLANSPONSOR (Sept.-Oct. 2019), bit.ly/3Z1Kirl.

the presumed retirement age, or soon thereafter.[3]  The asset allocation of a "to retirement" TDF remains static once the retirement date is reached.  On the other hand, a "through retirement" glide path expects participants to remain invested after reaching retirement and gradually draw down on their funds.  The terminal allocation of a "through" TDF is not reached until a predetermined number of years after the target date.  As the U.S. Department of Labor observed, "to retirement" funds "are concentrated in more conservative and less volatile investments at the target date, assuming that employees will want to cash out of the plan on the day they retire."[4] Investment analyst firm Morningstar concurs that "[m]anagers build a 'through' retirement glide path to account for a participant taking regular distributions in retirement from the fund, while they construct 'to' glide paths using the assumption that an investor will take the money out at retirement."[5]

27.     "To" strategies are managed to protect against the risk of a market decline significantly diminishing assets, while the "through" approach focuses on the risk of outliving savings.  Each strategy treats the other's primary focus as a secondary objective (*i.e.*, most "to" managers "have the objective of limiting portfolio volatility up to retirement as the primary goal, and the income throughout retirement is more of a secondary objective.").[6]  TDFs designed to take investors to retirement typically de-risk faster than their "through" peers, and while this may

---

[3]Lia Mitchell & Aron Szapiro, *White Paper: Right on Target? Plan Sponsors May Not Always Consider Participants' Behavior or Needs When Selecting Target-Date Glide Paths*, MORNINGSTAR (July 2022).

[4]Target Date Retirement Funds—Tips for ERISA Plan Fiduciaries, U.S. DEP'T OF LABOR (Feb. 2013), bit.ly/3r52RhD.

[5]Right on Target? Plan Sponsors May Not Always Consider Participants' Behavior or Needs When Selecting Target-Date Glide Paths, MORNINGSTAR (July 2022).

[6]Amanda Umpierrez, *Evaluating 'To' vs. 'Through' Glide Paths*, PLANSPONSOR (Feb. 17, 2021), bit.ly/44IGz3i.

offer greater potential protection against downside risk, it leaves investors exposed to the potentially destructive, lasting consequences of running out of money in retirement.  As retirees trend toward keeping savings in their retirement plans post-retirement, "through" glide paths have been more popular.[7]  Indeed, of the 28 TDF series launched in the past decade which remain active, nearly 80% adopt a "through" approach.[8]

28.    The underlying mutual funds that TDF managers choose to populate each asset class can be actively or passively managed.  TDFs comprised of primarily or entirely passive strategies provide broad market exposure at minimal cost and avoid the risk of active management underperformance and style drift.  TDFs filled with actively managed funds tend to provide more diversified asset class exposure while offering the potential for excess returns, particularly in less efficient asset classes where active management tends to outperform.

C.    Recordkeeping and Administrative Services

29.    Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider for the essential recordkeeping and administrative ("RK&A") services for the plan.  These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, and providing transaction processing, call center support, investment education and guidance, participant communications, and trust and custodial services.

30.    The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper."  In other words, recordkeeping fees and RK&A fees are one and the same and the terms are used

---

[7] Right on Target?, *supra* n.5.

[8] 2022 Target-Date Strategy Landscape, MORNINGSTAR (2022).

synonymously.

31.     Recordkeepers typically collect their fees from "direct" compensation and "indirect" compensation.

32.     Direct compensation is paid directly from plan assets and is reflected as a deduction in the value of participant accounts.

33.     Indirect Compensation is paid to the recordkeeper indirectly by third parties and is not transparent to retirement plan participants.  These fees are taken from the investment options before the value of the investment option is provided to the participant.  Thus, in most cases, participants are not aware they are paying these fees.  Most indirect compensation is typically collected by recordkeepers through asset-based "revenue sharing."

34.     Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined contribution plans, (*e.g.*, mutual funds, insurance products, collective trusts, separate accounts, *etc.*), or have some other ancillary line of business (*e.g.*, consulting) to sell to plans.  As a result, all recordkeepers consider the economic benefit of their entire relationship with a defined contribution plan when setting fees for their RK&A services.  Discounts in a RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (*e.g.*, investment management revenues).  In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

35.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet-style level of service (meaning that the services are provided, in retirement industry

parlance, on an "all-you-can-eat" basis).  These services include, but are not limited to, the following:

i.      Recordkeeping;

ii.     Transaction processing (including technology to provide participants access to investment options selected by the plan sponsor and to process purchases and sales of participants' assets);

iii.    Administrative services related to converting a plan from one recordkeeper to another;

iv.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of materials distributed to participants, *e.g.*, summary plan descriptions);

v.      Maintenance of an employer stock fund (if needed);

vi.     Plan document services, including updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

vii.    Plan consulting services, including assistance in selecting the investment lineup offered to participants;

viii.   Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[9] (excluding any separate fees charged by an independent third- party auditor);

ix.     Compliance support, including assistance interpreting plan provisions and

---

[9]The Form 5500 is the annual report that defined contribution plans are required to file with the U.S. Department of Labor and Department of Treasury pursuant to ERISA reporting requirements.

ensuring plan operation complies with legal requirements and plan provisions (excluding separate legal services provided by a third-party law firm); and

x.      Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

36.     This suite of essential RK&A services can be referred to as "Bundled RK&A" services.  These services are offered by all recordkeepers for one price (typically at a *per capita* rate), regardless of the services chosen or used by the plan.  Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, bids, and contracts understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  Any claim that recordkeeping expenses depend upon the level of services provided to a plan is both false and frivolous.  Nonetheless, fiduciary-defendants all too often attempt to stave off breach of fiduciary duty claims by disingenuously asserting that the cost of Bundled RK&A services depends upon service level, even though the marketplace for these services belies such an assertion.

37.     The second type of essential RK&A services all national recordkeepers provide, "A La Carte RK&A" services, often charge separate, additional fees based on the conduct and use of individual participants.  These fees are kept distinct from the Bundled RK&A arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  A La Carte RK&A services typically include, but are not limited to, the following:

i.      Loan processing;

ii.     Brokerage services/account maintenance (if offered by the plan);

      iii.     Distribution services; and

      iv.     Processing of qualified domestic relations orders

38.     All national recordkeepers have the capability to provide all the aforementioned RK&A services to large defined contribution plans, including those much smaller than the Plan.

39.     For large plans with more than 5,000 participants, any minor variations in the way these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. Indeed, the industry-wide practice of recordkeepers quoting fees for Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested confirms that recordkeepers view such differences as immaterial and inconsequential from a cost perspective. The Plan's investment consultant, Wilshire Associates ("Wilshire"), recognized this principle in providing Defendant with a benchmarking study (which presented flawed conclusions, as discussed below) in 2022 that compared the Plan's recordkeeping fees to those of "similar plans" from several broad databases, without regard for, or even mention of, any differences in services received by any comparator plan. In conducting such a study to assess the Plan's fees (albeit to erroneous results), Wilshire justifiably ignored any analysis of the services received by the different plans comprising the benchmark universe as unnecessary for the purpose of comparing the fees charged by recordkeepers to provide the same customary bundle of services to large retirement plans.

40.     While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all offer the same bundles and combinations of services.[10] Accordingly, the market for defined contribution plan RK&A

---

[10]Sarah Holden, James Duvall & Elena Barone Chism, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, ICI Research Perspective 27, No. 6 (June 2021), https://www.ici.org/system/files/2021-06/per27-06.pdf. *See* Figure 2 at p. 2 for a list of standard

services has become increasingly price competitive, particularly for larger plans, like the Plan, that have a considerable number of participants and significant assets.

41.     The marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  As a plan's participant count increases, the recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.  In other words, because the incremental variable costs for providing RK&A services depend on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases.  As a result, a recordkeeper will accept a lower fee to provide RK&A as the number of participants in the plan increases.

42.     It is axiomatic in the retirement plan services industry that, all else being equal: (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) as participant counts increase, the effective per-participant RK&A fee should decrease, assuming the same services are provided.

43.     Similarly, the average cost for a recordkeeper to provide services to a participant does not hinge on that participant's account balance.  In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.

44.     Informed, prudent plan fiduciaries are aware of these cost structure dynamics and marketplace realities and will leverage the plan's participant count to obtain lower effective per-

---

services provided to 401(k) plans.

participant fees.[11]

45.     Because recordkeeping fees are paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis.  This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

46.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider.  Recognizing that RK&A services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote.  These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

47.     Having received quotes, a prudent fiduciary will then negotiate with the plan's current provider for a lower fee or move to a new provider for the same (or better) services at a competitive (or lower) fee.  This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

48.     After negotiating the fee the plan will pay to the recordkeeper, the fiduciaries can allocate the fee among participant accounts at the negotiated per-participant rate, or *pro rata* based on participant account balances, or use a different, less common method.

---

[11] *See* Defined Contribution Plan Fee Practices, MERCER (2020), https://www.mercer.us/content/dam/mercer/attachments/north-america/us/us-2020-dc-fee-practices.pdf (noting that the costs incurred by recordkeepers "are directly impacted by the number of participants in the plan.").

**D.      Defendant's Breaches of Fiduciary Duties**

49.      Defendant has severely breached the fiduciary duty of prudence it owed to the Plan.  Plaintiffs did not acquire actual knowledge of Defendant's breaches at issue here until shortly before the initial Complaint commencing this action was filed.

**1.      The Plan's Excessive Recordkeeping/Administrative Costs**

50.      An obvious indicator of Defendant's breaches of its fiduciary duties is the Plan's excessive RK&A costs.  The impact of such high fees on participant balances is aggravated by the effect of compounding, to the significant detriment of participants over time.  This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



51.      During the Class Period, participants paid Wells Fargo for RK&A services through direct charges to their accounts.

52.      The RK&A services provided to the Plan are and were the same standard services identified above, and are and were the same as those provided to comparable plans.  Wells Fargo

provides no services to the Plan and its participants that are unusual or out of the ordinary. Indeed, under the Plan's service agreement with Wells Fargo, the recordkeeper has provided that Plan with directed trustee services, investment services, plan document services, recordkeeping services, communication services, and compliance services—***exactly the typical bundle of services provided by all recordkeepers to all large retirement plans***.  *See supra* ¶ 36.

53.     During the Class Period, Wells Fargo furnished disclosures to the Committee under 29 C.F.R. § 2550.408b-2, the Department of Labor's regulations implementing ERISA § 408(b)(2).  These very disclosures similarly list the services for which recordkeeping costs are charged to the Plan as payroll processing, distribution and loan services, compliance and regulatory services, employer stock administration services, retirement service center (call center), recordkeeping systems technology, and participant statements.  This again confirms the Plan received services directly comparable to the typical bundled services provided by national recordkeepers to all large retirement plans.  *See supra* ¶ 36.

54.     Regardless, for large plans like the Plan, any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

55.     Per Plaintiffs' account statements from the relevant period, participants were charged a $12.25 quarterly "recordkeeping fee," or $49 annually per participant.  The Plan's Summary Fee Disclosures and Forms 5500 corroborate and confirm that, since the beginning of the Class Period, Defendant caused the Plan to be charged this fee, which far exceeded the reasonable market rate.  The table below sets forth the annual per participant amounts the Plan ultimately paid to Wells Fargo in RK&A fees, per the Plan's Forms 5500.

|  | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| Participant Accounts with a Balance | 16,631 | 18,445 | 19,469 | 21,118 | 20,603 | 19,253 |
| Direct Compensation | $834,038 | $887,476 | $979,691 | $1,025,624 | $1,050,379 | $955,442 |
| Wells Fargo RK&A Fee ($/pp) | $50 | $48 | $50 | $49 | $51 | $50 |

56.     Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to obtain reasonable rates for RK&A services that were significantly lower than the effective per-participant RK&A rates set forth above.

57.     According to publicly available data and information from participant fee disclosures and Form 5500 filings of similarly sized defined contribution plans during the Class Period, other comparable plans were paying much lower fees than the Plan throughout the Class Period.  The ability of comparable plans to negotiate lower fees for materially identical services is clear and compelling evidence that the reasonable market rate is lower than the fee the Plan was paying.

58.     Table 1 below lists the RK&A fees paid by 31 similarly sized defined contribution plans to several different high-quality, national recordkeepers, which represent the prices available to the Plan during the Class Period.  Table 1 also indicates the number of participants and assets of each plan.

**Table 1**

| Plan | Participants | RK&A Fee ($) | RK&A Fee ($/pp) | Recordkeeper |
|---|---|---|---|---|
| Komatsu Mining Corp. Retirement Savings Plan | 5,235 | $263,330 | $50 | Fidelity |
| Menasha Corporation 401(k) Retirement Savings Plan | 5,442 | $304,429 | $56 | Prudential |
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,266 | $295,016 | $47 | Great West |
| Thedacare Retirement and 403(b) Savings Plan | 7,847 | | $43 | Transamerica |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,964 | $338,828 | $37 | Fidelity |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | 10,455 | $449,739 | $43 | Vanguard |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 11,388 | $473,410 | $42 | Vanguard |
| Viacom 401(k) Plan | 12,884 | $411,959 | $32 | Great West |
| Fortive Retirement Savings Plan | 13,502 | $472,673 | $35 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $483,191 | $33 | Fidelity |
| Michelin 401(k) Savings Plan | 15,880 | $543,332 | $34 | Vanguard |
| Ecolab Savings Plan and ESOP | 17,886 | $608,061 | $34 | Fidelity |
| **Stanley Black & Decker Retirement Account Plan** | **19,253** | **$955,442** | **$50** | **Wells Fargo** |
| Qualcomm Incorporated Employee Savings and Retirement Plan | 20,955 | $639,143 | $31 | Fidelity |
| MassMutual Thrift Plan | 23,131 | | $35 | MassMutual |
| The Rite Aid 01(k) Plan | 24,309 | $719,730 | $30 | Great West |
| Sanofi U.S. Group Savings Plan | 25,086 | $567,836 | $23 | T. Rowe Price |
| Dollar General Corp 401(k) Savings and Retirement Plan | 25,614 | $901,634 | $35 | Voya |
| Farmers Group, Inc. 401(k) Savings Plan | 26,826 | | $35 | Vanguard |
| Fidelity National Information Services, Inc. 401(k) Profit Sharing Plan | 27,396 | $958,957 | $35 | Vanguard |
| Philips North America 401(k) Plan | 28,348 | $720,606 | $23 | Prudential |
| Orlando Health, Inc. Retirement Savings Plan 403B | 29,229 | $870,097 | $30 | Fidelity |
| Baptist Health South Florida, Inc. 403(b) Employee Retirement Plan | 29,704 | | $23 | Transamerica |
| Bristol-Myers Squibb Savings and Investment Program | 30,518 | | $32 | Fidelity |
| Chevron Employee Savings Investment Plan | 33,484 | | $26 | Fidelity |
| Danaher Corporation & Subsidiaries Savings Plan | 35,467 | $1,062,204 | $30 | Fidelity |
| Beaumont Health 403(b) Retirement Savings Plan | 36,916 | | $28 | Fidelity |
| Tesla, Inc. 401(k) Plan | 39,720 | $1,178,160 | $30 | Fidelity |
| General Dynamics Corporation 401(k) Plan 6.0 | 45,018 | | $25 | Fidelity |
| Publicis Benefits Connection 401(k) Plan | 46,159 | $1,367,711 | $30 | Fidelity |
| Leidos, Inc. Retirement Plan | 46,995 | | $31 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $1,298,775 | $27 | Vanguard |

59.     When the fees in Table 1 are plotted by participant count (as shown in Table 2 below), the resulting graph illustrates the well-established and widely-understood dynamic in the RK&A marketplace that plans with larger participant counts are able to leverage their size to achieve lower relative RK&A fees.  National RK&A service providers maintain internal pricing curves that reflect the same dynamic, and they use such pricing curves in preparing bids to plans.

**Table 2**



60.    The RK&A fees calculated for each comparable plan in Tables 1 and 2 include all

the direct and indirect compensation paid to the recordkeeper disclosed on each plan's Form

5500,[12] accounting for Bundled and any A La Carte services.  Specifically, if the pricing

structure as described in the relevant Form 5500 reveals that some or all revenue sharing is not

returned to the plan, then the appropriate amount of revenue sharing is also included to calculate

the RK&A fees.  In some cases, the plan's investment options do not contain revenue sharing,

meaning any indirect revenue is immaterial to the RK&A fees.  In other plans, all of the revenue

sharing is returned to the plans and is therefore not included in the fee calculation.  The

calculated sum of the total RK&A fees that each plan paid to its recordkeeper is then divided by

the total number of participants with an account balance in the plan in order to determine the

plan's fees on a per-participant basis.  For the plans for which no total RK&A fee is provided in

---

[12]Fee calculations for the comparable plans are based on the information disclosed in each plan's
2020 Form 5500, or the most recently filed Form 5500 if 2020 is not available.

- 21 -

Table 1, the per participant fee was sourced directly from publicly available participant fee disclosures.[13] Accordingly, no calculation is necessary for these plans.

61.     The comparable plans above received at least the same RK&A services as the Plan. Therefore, the fees shown in Tables 1 and 2 above are apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK&A services to similar defined contribution plans.

62.     As Tables 1 and 2 above indicate, the fees the Plan paid for a materially identical package of services are much higher than those charged to plans with comparable (and in many cases smaller) participant counts. Indeed, based on fees paid by these comparator plans during the Class Period, it is more than reasonable to infer that Defendant failed to follow a prudent process to ensure that the Plan was paying only reasonable fees for RK&A services. In light of the amounts remitted to Wells Fargo throughout the Class Period, Defendant clearly engaged in virtually no examination, comparison, or benchmarking of the Plan's RK&A fees to those of other similarly sized defined contribution plans, or it was complicit in paying grossly excessive fees.

63.     Prevailing standards dictate that fiduciaries of large retirement plans regularly evaluate the fees paid out of plan assets (*i.e.*, participant accounts) to ensure that such fees are reasonable at all times. This entails conducting competitive bidding roughly every three years and appropriate benchmarking during gaps in competitive bidding. In fact, the Department of Labor formally recognized as early as 2010 that prudent plan fiduciaries normally conduct requests for proposal (the most formal type of competitive bidding) every three to five years.

---

[13]While participant fee disclosures for the vast majority of plans are not publicly available, the participant fee disclosures reflected in Tables 1 and 2 plainly validate the pricing curve set forth in Table 2 and confirm that comparable plans were able to achieve vastly lower RK&A fees than the Plan.

*See* 75 Fed. Reg. 41,619 (July 16, 2010).

64.      ***Defendant failed to conduct any competitive bidding***, in the form of an RFP or otherwise, during the Class Period.

65.      In 2022, the Committee received a benchmarking study.  The study, however, was not appropriately tailored to the Plan and could not accurately inform the Committee of the reasonable market rate for the Plan's RK&A services.  Apart from the 2022 benchmarking study, the Committee failed to conduct any investigation or examination into the appropriateness of the Plan's fees during the relevant period.

66.      The 2022 benchmarking study itself was flawed in execution, as Wilshire expressed the recordkeeping fees paid by similarly large plans as a percentage of total plan assets, as opposed to a dollars-per-participant figure.  As described above, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.  Accordingly, prudent plan fiduciaries evaluate recordkeeping fees on a per-participant basis.  This is because the per-participant fee for two plans with similar participant counts could look very different when expressed as a percentage of plan assets.  For example, consider two plans with 10,000 participants which both pay recordkeeping fees of $30 per participant, meaning both pay exactly $300,000 to the recordkeeper.  If plan A has $1 billion in assets and plan B has $500 million in assets, it will appear, when considering recordkeeping fees as a portion of assets, that plan A pays considerably less than plan B.  But such an analysis is fundamentally misaligned with how recordkeepers price plan services and how prudent plan fiduciaries and retirement plan professionals evaluate recordkeeping fees.  Accordingly, the 2022 benchmarking, which failed to present or analyze the fees of comparator plans on a per-participant basis, had no utility to the

Committee in assessing the reasonableness of the Plan's recordkeeping fees.

67.     Defendant's failure to recognize that the Plan and its participants were grossly overcharged for RK&A services and its failure to take effective remedial actions amount to a shocking breach of its fiduciary duties to the Plan.  To the extent Defendant had a process in place, it was imprudent and ineffective given the objectively unreasonable fees the Plan paid for RK&A services.  Had Defendant appropriately monitored the compensation paid to Wells Fargo and ensured that participants were only charged reasonable RK&A fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

**2.       The Plan's Investment in the BlackRock LifePath Index Funds**

68.     Among other investments, the Plan lineup has, since at least December 31, 2011,[14] offered the BlackRock LifePath Index Funds ("BlackRock TDFs"), a suite of ten TDFs.[15]  The BlackRock TDFs are significantly worse performing than many of the mutual fund alternatives offered by TDF providers and, throughout the Class Period, could not have led a prudent fiduciary to conclude that their retention in the Plan was justifiable.

69.     Defendant was responsible for crafting the Plan lineup and could have chosen from a wide range of readily available prudent alternative target date suites offered by competing TDF providers.  Instead, Defendant elected to retain the BlackRock TDFs, an imprudent decision that has deprived Plan participants of significant growth in their retirement assets.

70.     A simple weighing of all other TDFs available at the beginning of the Class

---

[14]The Plan's Forms 5500 provide a detailed schedule of the Plan's holdings at the end of each calendar year.  The suite of BlackRock TDFs appears as a Plan investment option as far back as the 2011 Form 5500.

[15]The Plan offered an eleventh BlackRock TDF, the 2020 vintage, for a substantial part of the Class Period.  During the Fourth Quarter of 2019, the 2020 Fund was reorganized into the Retirement Fund, and shareholders of the 2020 Fund received shares of the Retirement Fund.

Period—considering their actual realized outcomes and not solely projections relying on estimates and assumptions—would have raised significant concerns for prudent fiduciaries and indicated that the BlackRock TDFs were not a suitable and prudent option for the Plan. Any objective evaluation of the BlackRock TDFs would have resulted in the selection of a more consistent, better performing, and more appropriate TDF series.

71.    As is currently in vogue, Defendant appears to have chased the BlackRock TDFs' low fees without any risk/return tradeoff consideration of the value provided to participant account balances in exchange. In employing this fundamentally irrational decision-making process, Defendant failed to act in the sole interest of Plan participants and breached its fiduciary duties by imprudently selecting, retaining, and failing to appropriately monitor the clearly inferior BlackRock TDFs.

72.    Exacerbating Defendant's imprudent decisions to add and retain the BlackRock TDFs is the suite's designation as the Plan's Qualified Default Investment Alternative ("QDIA"). The BlackRock TDF with the target year closest to a participant's assumed retirement age (age 65) has served as the QDIA in the Plan throughout the Class Period. Under DOL regulations, retirement plan fiduciaries can designate one of the investment offerings in a plan's lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets. If participants do not indicate where their assets should be invested, all contributions are automatically invested in the QDIA. For this reason, it is vital for fiduciaries to understand the relevant plan participant population and ensure the QDIA is a suitable and prudent option. Indeed, Plan fiduciaries are responsible for the prudent selection and continuous monitoring of an appropriate QDIA.

73.    Given that the vast majority of Plan participants are not sophisticated investors,

many concentrate their retirement assets in TDFs by default.  Indeed, by December 31, 2020, approximately 39% of the Plan's assets were invested in the BlackRock TDFs.  As such, the impact of Defendant's imprudent selection of TDFs is magnified vis-à-vis other asset categories.

  i.  <u>No TDF is a Passively Managed Investment</u>

74. The managers of "active" investment funds try to add value by outperforming a chosen segment of the market.  Accordingly, when assessing an active fund manager's performance, plan fiduciaries and investment professionals will scrutinize the impact of the manager's decisions and the outcomes such decisions produced; in other words, the value the manager was able to add.  Conversely, "passive" fund managers merely seek to mimic the performance of a chosen segment of the market, typically a recognized market index.  Plan fiduciaries and investment professionals evaluate passive managers' ability to track the returns of their chosen market index by examining the fund's deviations from market index returns.  These two distinct investment management styles are thus judged through fundamentally different lenses.

75. A TDF is a fund of funds.  While the component investment funds of a TDF portfolio may be actively or passively managed, or a combination of both, the asset allocation decisions made by the fund managers in setting and updating the TDF glide path are active management decisions.  Thus, it is well understood in the investing industry and among retirement plan professionals and fiduciaries that all TDFs are inherently actively managed.[16]

---

[16]*See* Alliance Bernstein, Target-Date Retirement Funds: A Blueprint for Effective Portfolio Construction 52 (Oct. 2005), https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/target-date-funds-hearing/supplementalmaterials1.pdf ("First, we would like to correct a common misconception: There is no such thing as a passively managed target-date retirement fund. Substantial active decisions are made during the construction of all such funds: which asset classes to use, how much to allocate to each asset class and how to manage each underlying asset class."); Jeff Holt,

The failure to acknowledge this fundamental truth renders the evaluation of any TDF meaningless.

76.    There is no market index for TDF managers to mimic or track when setting a TDF's glide path.  Accordingly, construction of a glide path involves substantial decision making from TDF managers.  Among these decisions is whether to fill the asset class bands in a glide path with active or passive funds (or a combination of both).  In industry parlance, the BlackRock TDFs are recognized as having "passive implementation" because the portfolio is filled with index funds.  However, the Committee failed to appreciate the crucial distinction between a truly passive investment and the passive implementation of active asset allocation decisions, and thus fundamentally misunderstood the BlackRock TDFs to be passively managed.[17]

77.    Memorializing this misconception, despite acknowledgement that actively

---

The $1 Trillion Target-Date Fund Landscape, Morningstar (May 7, 2018) https://www.morningstar.com/funds/1-trillion-target-date-fund-landscape ("no target-date series is truly passively managed, as every target-date manager makes active decisions in designing a glide path and selecting asset classes."); John Greves, Jake Gilliam & Natallia Yazhova, Charles Schwab Investment Management, Passive Target Date Funds: Separating Myth From Reality 2 (2020) https://gravity.401kspecialistmag.com/wp-content/uploads/2020/11/TDF-11182020-CSIM-1.pdf ("The term "passive TDF" is also somewhat misleading. There is no such thing as a passive glide path design."); Jed Laskowitz, *Passive Funds and "Do No Harm" Are Not Synonymous*, Enterprising Investor (Sept. 15, 2021) https://blogs.cfainstitute.org/investor/2021/09/15/passive-funds-and-do-no-harm-are-not-synonymous/ ("it's important to remember there is no such thing as a passively managed TDF.").

[17]The fiduciary duty of prudence is comprised of two complementary components: procedural prudence and substantive prudence. But the presence of the former does not excuse the absence of the latter.  Substantive prudence requires a plan fiduciary to make a reasoned decision leading to an objectively appropriate result based on the information available.  In other words, investigation and evaluation do not excuse a rash or irrational decision. Although Defendant's process may have exhibited some markers of procedural prudence, the repeated decision to retain the BlackRock TDFs due to the illogical treatment of the BlackRock TDFs as index funds does not and cannot satisfy substantive prudence.  In other words, the nature of Defendant's breach of fiduciary duty is plain, clear and established under applicable law.

managed funds should be measured for their ability to perform well compared to their peers, the Plan's IPS names only the BlackRock custom benchmark as an appropriate benchmark for the BlackRock TDFs.  The BlackRock custom benchmark is a weighted mix of the benchmarks of the underlying portfolio funds of the BlackRock TDFs.  Using this custom benchmark is akin to looking in a mirror, and provides no basis to conclude anything, positive or negative, about the BlackRock TDFs' performance.  The solitary use of the custom benchmark, per the guidance of the IPS, was fatal to Defendant's investment monitoring process, as it rendered the Committee incapable of perceiving, much less considering or acting upon, the BlackRock TDFs' apparent and persistent underperformance.  Indeed, in mistaking an actively managed product for a passively managed one due to the portfolio's components, the Committee neglected to conduct any comparison of the BlackRock TDFs, the most important investment in the Plan, to a meaningful benchmark, thereby failing to apply its own enumerated evaluative criteria.

78.    The BlackRock custom benchmark only evaluates BlackRock's implementation of its asset allocation strategy.  Its purpose is to reflect the funds' asset allocation shifts over time by reweighting the component indices quarterly to match the weighting of the BlackRock TDF portfolio.  In other words, the custom benchmark is simply a reflection of the TDF portfolio. Comparison between the two does not evaluate the investment performance of the BlackRock TDFs in any way, as would be required by the Plan's own IPS were it not for the mischaracterization of the suite.  Instead, comparing the BlackRock TDF portfolio to the custom benchmark shows only the portfolio's aggregate tracking error, which demonstrates how well a fund is tracking the returns of the index.  For the BlackRock TDFs which are a fund of funds, the custom benchmark only indicates whether the *underlying* index funds are executing their respective mandates with regard to the index they are tracking.  Accordingly, the custom

benchmark is a measure of execution, not performance.  But confirming that a TDF is functioning as intended is not the same as determining whether it can support an objective expectation of performance sufficient to justify its retention in the Plan and determination that it remains in the best interest of Plan participants.  In other words, Defendant utterly failed to monitor the actual performance of the BlackRock TDFs (by choosing, in essence, a meaningless benchmark with respect to performance) in violation of the terms of the Plan's own IPS and applicable law.  The Committee gained no insight into the performance of the BlackRock TDFs, or how their returns compare to those of available alternatives, by reviewing the custom benchmark. [18]  This failure effectively prevented the Plan fiduciaries from conducting any meaningful ongoing monitoring of the performance of the BlackRock TDFs in accordance with the guidance established in the Plan's own IPS and as required by ERISA.

79.    The IPS establishes that actively managed funds should be evaluated against a relevant peer group of similar funds.  The prospectuses for the mutual fund versions of the BlackRock TDFs (which have the same investment strategy as the BlackRock TDFs in the Plan)[19] note that the series invests in a "portfolio of assets whose performance is expected to match approximately the performance of the Fund's custom benchmark index."  Despite the clear limitations of the custom benchmark as an evaluative tool *and contrary guidance in the IPS*, the Committee engaged in no regular and disciplined analysis or inquiry concerning the

---

[18]"Part of a fiduciary's responsibility in evaluating investment options is to consider reasonably available alternatives."  Alison V. Douglass & Christina Hennecken, Goodwin Proctor LLP Selecting, Evaluating, and Monitoring Investments in DC Plans: A Legal Perspective 4 (2021), https://www.goodwinlaw.com/-/media/files/publications/attorney-articles/2021/04_06-t-rowe-webinar-and-white-paper.pdf.

[19]There are no prospectuses available for the CIT version of the BlackRock TDFs; however, the identical strategy of the CIT and mutual fund versions of the BlackRock TDFs renders the prospectuses for the mutual fund versions reliable for present purposes.

performance of the BlackRock TDFs relative to a TDF peer universe during the relevant period. It is not possible to confirm a TDF remains in the best interests of Plan participants by only confirming that the product is functioning as intended. Therefore, the Committee was unable to recognize or track the BlackRock TDFs' consistent underperformance compared to available alternative TDFs on a rolling three- or five-year basis, which would have warranted further review and analysis under the IPS. Although past performance is not a sufficient predictor of future performance on its own, it is a necessary factor in any assessment of an investment's likelihood of future out- or underperformance. Indeed, the Plan's IPS recognized this by naming performance during the previous three- and five-year periods as the relevant monitoring time horizons.

80.    The Committee's failure to consider in any way the outcomes realized by Plan participants who invested in the BlackRock TDFs rendered its monitoring process devoid of any mechanism to identify an investment that might have an expectation of underperforming comparable alternatives. The Plan's IPS advises the Committee that funds may be terminated at any time for any of several reasons, including sustained underperformance compared to a benchmark or peer group. Given that the returns of the BlackRock TDFs were not likely to underperform a benchmark they were "expected to match" (according to the funds' manager), it was necessary for the Committee to regularly evaluate the returns of the BlackRock TDFs against a group or universe of peer TDFs.

ii.    The Custom Peer Group

81.    In apparent recognition of the necessity and utility of comparing the performance of the BlackRock TDFs to more than just the custom benchmark, the quarterly reports the Committee received from Wilshire throughout the Class Period compared the BlackRock TDF

returns to those of a peer group of nine specific alternative TDF suites, in the form of a peer ranking of the returns generated by BlackRock. There is no evidence that the Committee ever considered, discussed, or analyzed this comparative data. Despite the evident relevance of assessing the realized outcomes of the BlackRock TDFs against those of available alternatives, the performance (or in most cases, underperformance) of the suite was not discussed, nor even mentioned, at a single Committee meeting.

82.    The Plan's IPS prescribes that investment performance be evaluated over three- and five-year periods and notes that funds may be removed from the Plan investment menu if they demonstrate persistent underperformance over these time horizons.[20] The Committee met on March 27, 2017 to ostensibly review the quarterly materials provided by Wilshire containing data as of the first quarter-end following the start of the Class Period (Third Quarter of 2016). A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the returns of the BlackRock TDFs presented on a peer-relative basis by Wilshire, ranked from 1 (best) to 100 (worst).

---

[20]Virtually all competent investment advisors emphasize that fiduciaries should focus on three- and five-year returns to evaluate the performance of an investment over periods most closely approximating a market cycle and persistent poor performance over those periods demands investigation and action by fiduciaries. Any suggestion that a TDF has a lifespan of 10 or 25 years and, therefore, performance metrics of three to five years should not be considered is nonsensical because (a) at any point in time, many vintages of TDFs have shorter lifespans than 10, and especially 25, years, and (b) most importantly, in light of employment mobility in the United States (with the average employee holding a position for slightly more than four years), competent and informed fiduciaries understand that many participants will not maintain their TDF investments within a defined contribution plan such as the Plan until the actual target date of the given investment. Thus, three- and five-year performance is paramount in the minds of any competent fiduciary of a retirement plan. The Plan's IPS concurs.

| Peer Rank as of Q3 2016 | | |
|---|---|---|
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 56 | 50 |
| 2020 | 89 | 90 |
| 2025 | 34 | 84 |
| 2030 | 45 | 75 |
| 2035 | 45 | 100 |
| 2040 | 34 | 88 |
| 2045 | 34 | 67 |
| 2050 | 34 | 38 |
| 2055 | 12 | 21 |

83.     Despite the majority of the suite failing to generate a five-year return that beat the peer median (a standard prescribed by the IPS), the meeting minutes reflect *no discussion or mention* of the performance of the BlackRock TDFs.

84.     The Committee met on June 27, 2017 to review the Plan's investment results as of the end of the Fourth Quarter of 2016.  A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the peer-relative returns provided by Wilshire:

| Peer Rank as of Q4 2016 | | |
|---|---|---|
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 34 | 45 |
| 2020 | 89 | 85 |
| 2025 | 78 | 100 |
| 2030 | 78 | 100 |
| 2035 | 67 | 100 |
| 2040 | 78 | 100 |
| 2045 | 67 | 100 |
| 2050 | 67 | 88 |
| 2055 | 45 | 80 |

85.     Despite the failure of the majority of the suite to beat the peer median over a three- or five-year period, *no discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.  Prudent fiduciaries would have noted, discussed, and scrutinized the suite's marked underperformance.

86.     The Committee met on October 2, 2017 to review the Plan's investment results as of the end of the First Quarter of 2017.  A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the below peer-relative returns provided by Wilshire:

| Peer Rank as of Q1 2017 | | |
|---|---|---|
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 75 | 68 |
| 2020 | 85 | 65 |
| 2025 | 75 | 85 |
| 2030 | 75 | 85 |
| 2035 | 70 | 85 |
| 2040 | 75 | 90 |
| 2045 | 70 | 90 |
| 2050 | 70 | 90 |
| 2055 | 70 | 85 |

87.     Despite the failure of the entire suite to beat the peer median over a three- or five-year period, *no discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

88.     The Committee met on January 12, 2018 to review the Plan's investment results as of the end of the Second Quarter of 2017.  A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the below peer-relative returns provided by Wilshire:

| Peer Rank as of Q2 2017 | | |
|---|---|---|
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 56 | 50 |
| 2020 | 89 | 100 |
| 2025 | 89 | 100 |
| 2030 | 89 | 100 |
| 2035 | 89 | 100 |
| 2040 | 89 | 100 |
| 2045 | 89 | 100 |
| 2050 | 89 | 100 |
| 2055 | 89 | 100 |

89.     Despite the failure of the entire suite to beat the peer median over a three- or five-year period, *no discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

90.     The Committee met on March 26, 2018 to review the Plan's investment results as of the end of the Third Quarter of 2017.  A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the below peer-relative returns provided by Wilshire:

| Peer Rank as of Q3 2017 | | |
|---|---|---|
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 56 | 50 |
| 2020 | 89 | 88 |
| 2025 | 89 | 100 |
| 2030 | 89 | 100 |
| 2035 | 78 | 100 |
| 2040 | 78 | 100 |
| 2045 | 89 | 100 |
| 2050 | 89 | 100 |
| 2055 | 89 | 86 |

91.     Despite the failure of the majority of the suite to beat the peer median over a three- or five-year period, *no discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

92.     The Committee met on July 10, 2018 to review the Plan's investment results as of the end of the Fourth Quarter of 2017.  A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the below peer-relative returns provided by Wilshire:

| Peer Rank as of Q4 2017 | | |
|---|---|---|
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 55 | 44 |
| 2020 | 67 | 78 |
| 2025 | 78 | 89 |
| 2030 | 78 | 89 |
| 2035 | 78 | 89 |
| 2040 | 67 | 100 |
| 2045 | 67 | 100 |
| 2050 | 56 | 100 |
| 2055 | 56 | 89 |

93.    Despite the failure of the entire suite to beat the peer median over a three-year period and all but a single vintage to beat the peer median over a five-year period, *no discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

94.    The Committee met on December 5, 2018 to review the Plan's investment results as of the end of the First Quarter of 2018.  A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the below peer-relative returns provided by Wilshire:

| Peer Rank as of Q1 2018 | | |
|---|---|---|
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 55 | 44 |
| 2020 | 78 | 89 |
| 2025 | 78 | 89 |
| 2030 | 78 | 89 |
| 2035 | 78 | 89 |
| 2040 | 78 | 89 |
| 2045 | 56 | 100 |
| 2050 | 56 | 100 |
| 2055 | 67 | 89 |

95.    Despite the failure of the entire suite to beat the peer median over a three-year period and all but a single vintage to beat the peer median over a five-year period, *no discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

96.    The Committee met on April 10, 2019 to review the Plan's investment results as

- 35 -

of the end of the Second Quarter of 2018 and the end of the Third Quarter of 2018.  A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the below peer-relative returns provided by Wilshire:

| Peer Rank as of Q2 2018 | | |
| --- | --- | --- |
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 77 | 66 |
| 2020 | 78 | 78 |
| 2025 | 78 | 89 |
| 2030 | 78 | 89 |
| 2035 | 45 | 78 |
| 2040 | 45 | 78 |
| 2045 | 45 | 100 |
| 2050 | 56 | 100 |
| 2055 | 56 | 100 |

| Peer Rank as of Q3 2018 | | |
| --- | --- | --- |
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 66 | 44 |
| 2020 | 78 | 78 |
| 2025 | 78 | 89 |
| 2030 | 78 | 89 |
| 2035 | 67 | 89 |
| 2040 | 45 | 89 |
| 2045 | 56 | 89 |
| 2050 | 56 | 89 |
| 2055 | 56 | 89 |

97.    Again, all but a few vintages failed to beat the peer median over a three- and five-year period as of each quarter-end.  Nonetheless, ***no discussion or mention*** of the BlackRock TDFs' returns is reflected in the meeting minutes.

98.    The Committee met on June 13, 2019 to review the Plan's investment results as of the end of the Fourth Quarter of 2018.  A fiduciary prudently monitoring the BlackRock TDFs, absent any fundamental misconception that they were merely akin to passive investments, would have noted and considered the below peer-relative returns provided by Wilshire:

| Peer Rank as of Q4 2018 | | |
| --- | --- | --- |
| BlackRock TDF | 3-Year | 5-Year |
| Retirement | 77 | 55 |
| 2020 | 45 | 67 |
| 2025 | 45 | 78 |
| 2030 | 45 | 67 |
| 2035 | 45 | 56 |
| 2040 | 45 | 56 |
| 2045 | 56 | 56 |
| 2050 | 56 | 56 |
| 2055 | 56 | 56 |

99.    Despite the failure of the majority of the suite to beat the peer median over a three- or five-year period, *no discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

100.    The Plan's IPS emphasizes the importance of the consistency of a fund's relative performance or underperformance.  Data made available to the Committee (but ignored due to a blatant mischaracterization of the Plan's most important investment product) demonstrates the BlackRock TDFs' consistent pattern of underperformance, which would have convinced a fiduciary prudently monitoring the Plan investment menu to investigate alternative TDFs.  To the extent Defendant's vendors, including Wilshire, failed to note concerns with the Plan's investments, the Committee undertook no effort to exonerate or even inquire about the BlackRock TDFs despite the suite's obvious failures of the monitoring criteria established in the IPS Defendant ratified on behalf of the Plan.  Had the Committee been consistently and appropriately monitoring the BlackRock TDFs' performance against the peer group provided by its own advisor and adhering to the Plan's own IPS, it would have had no justifiable basis to retain the BlackRock TDFs.

iii.    The S&P Target Date Indices

101.    As an additional evaluative tool, prudent fiduciaries will assess a TDF's risk and

return characteristics compared to the TDF industry at large, ***an evaluative standard embraced by the Plan's IPS itself***. According to Morningstar, the Standard and Poor's Target Date Indices ("S&P Indices") are the most common benchmark used to approximate the overall performance of the TDF industry. The S&P Indices, which include a separately calculated index for each target date, "measure[] the performance of sub-indices selected and weighted to represent a consensus of the opportunity set available in the U.S. universe of target date funds."[21] As a composite of the disparate strategies and styles present in the broad universe of investable alternative TDFs and a representation of the applicable peer universe, the S&P Indices are an appropriate, meaningful benchmark comparator for the BlackRock TDFs. Because distinct TDF suites take different approaches to achieving the same objective (*i.e.*, preparing investors for retirement by a particular date), the S&P Indices provide an amalgamation of the different characteristics of TDF strategies: TDFs with actively and passively managed underlying funds, TDFs with different risk profiles, and TDFs with differing asset allocations among stocks, bonds, and cash. Accordingly, the S&P Target Date Indices are the most widely used TDF benchmark by investment managers and informed retirement plan fiduciaries.

iv.     The Comparator TDFs

102.    Measured against appropriate, available alternative TDFs, the BlackRock TDFs are a vastly inferior retirement solution that a prudent fiduciary could not have justifiably retained in the Plan, as the persistence of the suite's underperformance would have been flagged by any fiduciary appropriately understanding TDFs as actively managed investment products. Throughout the Class Period, there were many TDF offerings that consistently and dramatically

---

[21]S&P Dow Jones Indices, *S&P Target Date Index Series Methodology* 3 (April 2023), https://www.spglobal.com/spdji/en/documents/methodologies/methodology-sp-target-date.pdf.

outperformed the BlackRock TDFs, providing investors with substantially more capital appreciation.  Critically, at the time of Defendants' decisions to select and retain the BlackRock TDFs, those alternatives—unlike the BlackRock TDFs—supported a reasonable expectation of return to justify selection and retention in the Plan.  Accordingly, the Plan's investment in the BlackRock TDFs has resulted in participants missing out on millions of dollars in retirement savings growth that could have been achieved through an investment in any of the below alternative TDFs, and indeed many other options.

103.    Prudent fiduciaries evaluate TDF returns against an appropriate index, a broad group of all peer TDFs, and specific, readily investable alternatives, to ensure that participants are benefiting from the current TDF offering.  In addition to consideration of broader benchmarks, it is incumbent on plan fiduciaries and a component of the standard of care applicable throughout the Class Period to assess TDFs against readily available prudent alternatives to ensure that participants are best served by the options available to them.  Awareness of investible alternatives is even more important in relation to a plan's QDIA, given the gravitation of plan assets to the QDIA and importance of the QDIA to the overall design of a plan's investment menu.

104.    This is particularly important in the context of the TDF market.  Investment advisors considering investments for addition to a retirement plan lineup regularly apply initial screens that funds must pass in order to be considered for a plan, including requiring that candidate funds have sufficient assets under management ("AUM") such that the plan's assets would not represent a disproportionately large share of the fund's assets.

105.    The TDF market is particularly top heavy; by the end of 2021, the top six largest TDF series managed approximately three-quarters of all TDF assets.  Accordingly, most of the

TDF suites available for investment would fail initial asset-level screening criteria applicable to the Plan. Indeed, by the end of 2016, the Plan's approximately $507 million in the BlackRock TDFs would represent less than 5% of the assets under management of only 10 available TDF series, or just 17% of options available in the TDF universe. In light of the structure of the TDF marketplace and commonly used minimum AUM criteria, it would not be relevant to compare the BlackRock TDFs to TDF series with significantly smaller levels of AUM because the Plan could not responsibly invest in them (since its assets would account for too much of the AUM under normal and accepted investment principles).

106.    The largest six TDF series managed approximately three-quarters of all TDF assets:

| Target Date Series | Mutual Fund ($B) | CIT ($B) | Total ($B) | Market Share |
|---|---|---|---|---|
| Vanguard Target Retirement | 660 | 530 | 1,190 | 36.4% |
| T. Rowe Price Retirement | 180 | 170 | 350 | 10.7% |
| BlackRock LifePath Index | 61 | 226 | 287 | 8.8% |
| American Funds Target Date Retirement | 239 | 9 | 248 | 7.6% |
| Fidelity Freedom | 221 | - | 221 | 6.8% |
| Fidelity Freedom Index | 106 | 46 | 152 | 4.6% |

107.    Accordingly, four of the five non-BlackRock series shown above (the "Comparator TDFs") represent an ideal group for comparison, as they represent the most likely alternatives to be selected were the BlackRock TDFs to be replaced.[22] In fact, the Comparator

---

[22]The other TDF series in the largest six by market share during the relevant period was the Fidelity Freedom Funds ("Freedom Funds"), which do not represent an appropriate comparator. The Freedom Funds would have been an imprudent selection for the Plan for the duration of the Class Period due to myriad quantitative and qualitative red flags after undergoing a strategy overhaul in 2014. As a result of these issues, the Freedom Funds lost considerable assets and market share after their strategy overhaul in 2014. Yet even the anemic and imprudent Freedom Funds outperformed the BlackRock TDFs during the Class Period. While the Freedom Funds were not a suitable alternative for the Plan, a fiduciary applying the requisite scrutiny to the BlackRock TDFs would have been aware of their underperformance compared to the Freedom Funds, despite the issues plaguing the Freedom Funds. This is even further confirmation of the inability of the BlackRock TDFs to provide competitive returns throughout the Class Period.

TDFs represent the *exact type of universe of similar funds against which the IPS requires non-passively managed investments be evaluated*.  It bears noting that hundreds of retirement plan

fiduciaries select a new TDF suite each year.  Conducting a TDF replacement search is simply

not possible without measuring TDFs with different styles, strategies, risk profiles and asset

allocations.

108.    Defendants could have sought comparative returns data and other metrics for each

of the Comparator TDFs in real-time throughout the Class Period from the Plan's recordkeeper,

Wells Fargo, Wilshire, or the Plan's other service providers, or easily obtained it themselves

through just a few clicks of a computer mouse.  When evaluated against the Comparator TDFs,

both individually and as a group, the returns of the BlackRock TDFs, at all stages along the glide

path from aggressive to conservative, paled in comparison to those of the readily available

alternatives.  Such persistent underperformance should have been sufficient under the terms of

the IPS to convince the Committee to remove the BlackRock TDFs for future noncompliance

with its performance standards.  Had the Committee's ongoing review of the BlackRock TDFs

not been fatally limited by its fundamental misunderstanding of the investment product,

Defendants' adherence to the Plan's IPS should have yielded a similar conclusion.

109.    Any suggestion that such comparison is inappropriate because "to" glide paths,

like that of the BlackRock TDFs, adopt a more conservative approach is misleading.  While the

BlackRock TDFs de-risk at a quicker pace than most of the Comparator TDFs, the resulting

equity allocation discrepancy is only reflected in its two most conservative vintages, the 2025

and Retirement TDFs.[23]  Indeed, the BlackRock TDF suite has the industry's most aggressive

---

[23]It necessarily follows that the percentage of assets in a TDF vintage which are not allocated to equities are in some combination of fixed income instruments and cash (with the latter appearing in TDF portfolios primarily as the retirement date approaches).  For example, when the table

glide path for investors furthest from retirement and maintains a comparable equity allocation to its peers until an investor is approaching retirement.[24]

| Percentage of Portfolio in Equities | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Target Year | 2065 | 2060 | 2055 | 2050 | 2045 | 2040 | 2035 | 2030 | 2025 | 2020 | 2015 | 2010 | 2005 | Retire |
| American Funds Trgt Date Retire | 85 | 85 | 85 | 85 | 84 | 81 | 71 | 59 | 50 | 45 | 42 | 39 | - | - |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 89 | 77 | 62 | 56 | 49 | 40 | 30 | 21 | 19 |
| T. Rowe Price Retirement | 94 | 94 | 94 | 94 | 92 | 88 | 79 | 69 | 58 | 51 | 47 | 44 | 41 | - |
| Vanguard Target Retirement | 87 | 87 | 87 | 87 | 84 | 76 | 69 | 62 | 54 | 42 | 29 | - | - | 29 |
| BlackRock LifePath Index | 97 | 97 | 97 | 96 | 91 | 82 | 72 | 60 | 48 | 40 | - | - | - | - |
| Comparator TDF Average | 89 | 89 | 89 | 89 | 88 | 84 | 74 | 63 | 55 | 47 | | | | |
| BlackRock +/- Average | **8** | **8** | **8** | **7** | **4** | **-2** | **-2** | **-3** | **-7** | **-7** | | | | |

110.    The BlackRock TDFs are considerably more aggressive than the Comparator TDFs from the vintage intended for the youngest investors through those with a target retirement date of 2050.  For the 2045 through 2030 vintages, the latter of which is managed for investors currently within ten years of their anticipated retirement date, the difference in equity allocations between the BlackRock TDFs and the Comparator TDFs is negligible.  Though the BlackRock TDFs become considerably more conservative in the 2025 vintage and at retirement, each of the Comparator TDFs ultimately reach a terminal equity allocation that is at or below the 40% of the BlackRock TDFs.

---

"Percentage of Portfolio in Equities" notes that the allocation of the BlackRock 2055 TDF is 97% equity, this means that 3% of the portfolio is allocated to a mix of bonds and cash.

[24]Current equity allocations were compiled from Vanguard Advisor's online "Compare Products" tool.  Where an equity allocation is blank, the TDF does not offer that respective vintage.  The equity allocation in the BlackRock TDFs' Retirement vintage is shown in the 2020 column.



v.    <u>Performance Comparisons</u>

111.    The contention that the performance of a "to," ostensibly more conservative, TDF cannot be compared to more aggressive series relies on the presumption that a considerably heavier weight to equities will likely produce greater returns, as compensation for the assumption of greater risk.[25]  The industry-leading equity allocation of the longest-dated vintages of the BlackRock TDFs has refuted this notion consistently and dramatically throughout the Class Period.  The repeatedly inferior returns of the vintages serving young investors are matched by similar performance shortcomings across the BlackRock TDFs' glide path,[26] as reflected in the

_____

[25]Investment advisors who have analyzed plans offering TDFs and participant behavior have concluded that "focusing on whether a glide path is designed to take an individual "to" versus "through" retirement created product groupings that did not provide meaningful comparisons," given that "some "to retirement" products had a more aggressive glide path than "through retirement" options."  Cammack Retirement Group, *White Paper: A Better Methodology for Monitoring Target Date Funds* (2014).

[26]The only exception is the BlackRock Retirement TDF, which has regularly generated better trailing returns than the two Comparator TDFs that also offer a Retirement vintage (Fidelity

three- and five-year annualized returns data below comparing the performance of the BlackRock TDFs to those of the Comparator TDFs, as well as to the performance of the broader universe of TDFs, as represented by the S&P Indices.  Again, this stark, consistent underperformance would have been readily apparent to any fiduciary appropriately evaluating the BlackRock TDFs against peer funds and not solely a custom benchmark that the TDFs almost exactly mimic.

112.    An analysis of a TDF's risk-adjusted return, in concert with its actual return, can control for any differences in asset allocation among comparators (and is prescribed as an evaluative metric in the IPS).  The Sharpe ratio metric, a common component of a fiduciary investment monitoring,[27] accounts for differing levels of risk by measuring the performance of an investment, such as a TDF, compared to the performance of similar investments, after adjusting for risk.  More specifically, the Sharpe ratio represents the additional amount of return that an investor receives per unit increase of risk.  The Sharpe ratio is computed by comparing a fund manager's outperformance of the risk-free rate to the standard deviation of the manager's performance.  Applied to TDFs, this metric enables the comparison of suites with disparate equity and fixed income allocations as well as both "to" and "through" management styles (each resulting in varying levels of risk) by controlling for those differences.  In comparing two TDFs, the Sharpe ratio enables plan fiduciaries to determine whether Manager A, which has assumed greater risks than manager B, is appropriately compensating investors in the form of relatively

---

Freedom Index and Vanguard Target Retirement).  But the outperformance of a single vintage does not exonerate the rest of the suite's putrid performance.  Indeed, TDFs are evaluated and selected as a single suite.  Moreover, as the BlackRock TDFs are a "to retirement" investment, they are managed with the expectation that investors will withdraw their assets from the Plan upon reaching the Retirement vintage or shortly thereafter.

[27]While the Plan's IPS does not explicitly name the Sharpe ratio, it does call generally for an analysis of investments' risk-adjusted returns.

superior returns.[28]  In other words, the Sharpe ratios can inform investors and responsible

fiduciaries whether the investment they are considering is worth it compared to other readily

available investments.

113.    The below performance data represent information that was easily accessible to

the Committee during the Class Period and would have been reviewed by prudent fiduciaries.

***None of the below data was reviewed by the Committee at its meetings during the Class Period.***

Defendants could have sought these comparative returns data at any time from Wells Fargo or

Wilshire, as well as from the Plan's other service providers, or, in the alternative, obtained it

themselves in real time through just a few clicks of a computer mouse.  At any point in the Class

Period, such data would have been sufficient to convince a fiduciary following a prudent process

(or the Plan's IPS) to investigate alternatives and ultimately replace the BlackRock TDFs.

114.    As of the end of the Second Quarter of 2016, the entire BlackRock TDF suite,

except for the Retirement vintage, trailed the corresponding S&P Indices on a three- and five-

year basis, indicating the type of underperformance against a relevant peer universe that the IPS

cautions should be grounds for dismissal of an investment should the situation not improve.

Further, the prevailing standard of care for investment monitoring demands awareness and

consideration of *rolling* performance to identify trends of out- or underperformance, a standard

with which the IPS agrees.  While underperformance over a single three- or five-year period is a

cause for concern and scrutiny, prudent fiduciaries will seek to understand the reasons for the

---

[28]Consider the following example: Manager A generates a return of 15% and Manager B generates a return of 12%.  The risk-free rate is 5%.  Manager A's portfolio has a standard deviation of 8% while Manager B's portfolio has a standard deviation of 5%.  In this example, Manager A's Sharpe ratio is 1.25; Manager B's is 1.4.  Though Manager A generated higher actual returns, their assumption of greater risk rendered their risk-adjusted returns inferior to those of Manager B.

underperformance and closely monitor the investment to see if it subsequently outperforms.[29] Underperformance over several consecutive three- or five-year trailing periods, however, is a cause for both alarm and action. Due to its fundamental misunderstanding of the BlackRock TDFs as an investment product, the Committee never considered or reviewed the BlackRock TDFs' inability to generate returns above those of their peers, as represented by the S&P Indices, over three- and five-year periods dating back to at least the Second Quarter of 2014. In fact, the Committee's misconception of the BlackRock TDFs rendered it unable to perceive, much less discuss, the suite's lagging returns relative to its peers when it met to review the Second Quarter of 2014, Third Quarter of 2014, Fourth Quarter of 2014, First Quarter of 2015, Second Quarter of 2015, Third Quarter of 2015, Fourth Quarter of 2015, the First Quarter of 2016, and the Second Quarter of 2016. Had it been engaged in an appropriate ongoing review of the BlackRock TDFs, the Committee would have been aware at its March 27, 2017 meeting of the performance shortcomings visible at each of the previous quarterly meetings, which presented compelling information requiring a serious and deliberate decision as to whether there was any basis to retain the Blackrock TDFs, as required under the IPS. Sustained underperformance is the clearest indication of a manager's inability to provide value, which is why the IPS focuses on those criteria.

115.    Such a dismal trend should have been a strong indicator to the Committee of the BlackRock TDFs' unsuitability for the Plan, and accordingly sufficient reason for the Committee to investigate alternative TDFs. The suite's consistent underperformance against the Comparator TDFs served as further confirmation of the BlackRock TDFs' inferiority. The entire suite, bar

---

[29]It should be noted that "improved" or lessening underperformance over time is still just that: underperformance. A fund manager that persistently fails to outperform, however great or slight the underperformance, persistently fails to add value.

the Retirement vintage, ranked in the bottom half among the Comparator TDFs.  Retirement plan

fiduciaries prudently monitoring the BlackRock TDFs would have considered and noted the

underperformance against each of BlackRock's closest competitors, reflected in the tables below.

- The Committee met on March 27, 2017 to review the Plan's investment results as of the end of the Third Quarter of 2016. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs exhibited severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices.  In addition, the suite's three- and five-year Plan-asset weighted Sharpe ratios ranked in the 61st and 69th percentile, respectively, among its peer group, as defined by Morningstar.  *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 3Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.07 | 5.33 | 5.56 | 5.74 | 5.91 | 6.08 | 6.20 | 6.30 |
| Outperformance vs S&P TDF Index | (0.68) | (0.68) | (0.74) | (0.85) | (0.86) | (0.79) | (0.74) | (0.63) |
| Best Performing Comparator TDF | 6.67 | 7.11 | 7.55 | 7.67 | 7.70 | 7.75 | 7.77 | 7.75 |
| Worst Performing Comparator TDF | 5.26 | 5.81 | 6.12 | 6.35 | 6.36 | 6.39 | 6.42 | 6.45 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 3Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 7.72 | 8.54 | 9.24 | 9.87 | 10.44 | 10.95 | 11.44 | 11.86 |
| Outperformance vs S&P TDF Index | (1.33) | (1.29) | (1.33) | (1.26) | (1.11) | (0.92) | (0.70) | (0.47) |
| Best Performing Comparator TDF | 10.65 | 12.01 | 12.76 | 12.91 | 13.07 | 13.11 | 13.13 | 13.13 |
| Worst Performing Comparator TDF | 7.65 | 8.81 | 9.25 | 10.13 | 10.22 | 10.36 | 10.53 | 10.73 |
| BlackRock Rank (out of 5) | 4 | Last | Last | Last | 4 | 4 | 4 | 4 |

| Sharpe Ratio as of 3Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | 3 | 3 | 4 | 4 | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 3 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

- The Committee met on June 27, 2017 to review the Plan's investment results as of the end of the Fourth Quarter of 2016. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices.  In addition, the suite's three- and five-year Plan-asset weighted Sharpe ratios ranked in the 53rd and 73rd percentile, respectively, among its peer group.  *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 4Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 3.68 | 3.88 | 4.05 | 4.19 | 4.30 | 4.38 | 4.41 | 4.41 |
| Outperformance vs S&P TDF Index | (0.50) | (0.44) | (0.44) | (0.47) | (0.46) | (0.45) | (0.50) | (0.51) |
| Best Performing Comparator TDF | 4.61 | 4.67 | 5.03 | 5.15 | 5.19 | 5.28 | 5.28 | 5.26 |
| Worst Performing Comparator TDF | 3.96 | 4.23 | 4.52 | 4.56 | 4.61 | 4.62 | 4.65 | 4.64 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 4Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.45 | 7.19 | 7.84 | 8.45 | 8.94 | 9.42 | 9.82 | 10.16 |
| Outperformance vs S&P TDF Index | (1.22) | (1.19) | (1.20) | (1.15) | (1.06) | (0.89) | (0.78) | (0.66) |
| Best Performing Comparator TDF | 8.96 | 10.40 | 11.14 | 11.31 | 11.46 | 11.51 | 11.52 | 11.50 |
| Worst Performing Comparator TDF | 6.55 | 7.59 | 8.12 | 8.94 | 9.02 | 9.16 | 9.26 | 9.45 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | 4 | 4 | 4 |

| Sharpe Ratio as of 4Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | 3 | 3 | 3 | 4 | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 4 | 4 | 4 | 4 | 4 | Last | 4 | 4 |

- The Committee met on October 2, 2017 to review the Plan's investment results as of the end of the First Quarter of 2017. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's three- and five-year Plan-asset weighted Sharpe ratios ranked in the 67th and 74th percentile, respectively, among its peer group. ***No discussion or mention*** of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 1Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.09 | 4.48 | 4.83 | 5.14 | 5.40 | 5.56 | 5.62 | 5.62 |
| Outperformance vs S&P TDF Index | (0.80) | (0.68) | (0.63) | (0.61) | (0.54) | (0.53) | (0.63) | (0.71) |
| Best Performing Comparator TDF | 5.37 | 5.72 | 6.38 | 6.73 | 6.84 | 6.99 | 7.01 | 7.00 |
| Worst Performing Comparator TDF | 4.78 | 5.14 | 5.72 | 5.95 | 6.14 | 6.17 | 6.20 | 6.17 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 1Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.76 | 6.42 | 7.01 | 7.56 | 8.01 | 8.40 | 8.68 | 8.92 |
| Outperformance vs S&P TDF Index | (1.06) | (1.00) | (0.98) | (0.94) | (0.85) | (0.75) | (0.77) | (0.79) |
| Best Performing Comparator TDF | 8.21 | 9.36 | 10.13 | 10.43 | 10.59 | 10.67 | 10.69 | 10.66 |
| Worst Performing Comparator TDF | 6.04 | 6.91 | 7.56 | 8.27 | 8.33 | 8.42 | 8.46 | 8.61 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 |

| Sharpe Ratio as of 1Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 4 | 4 | 4 | 4 | Last | Last | Last | Last |

- The Committee met on January 12, 2018 to review the Plan's investment results as of the end of the Second Quarter of 2017. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's three- and five-year Plan-asset weighted Sharpe ratios ranked in the 70th and 75th percentile, respectively, among its peer group. ***No discussion or mention*** of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 2Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 3.67 | 4.08 | 4.45 | 4.79 | 5.07 | 5.23 | 5.25 | 5.19 |
| Outperformance vs S&P TDF Index | (0.91) | (0.78) | (0.71) | (0.68) | (0.59) | (0.58) | (0.71) | (0.84) |
| Best Performing Comparator TDF | 5.10 | 5.57 | 6.08 | 6.57 | 6.69 | 6.85 | 6.87 | 6.86 |
| Worst Performing Comparator TDF | 4.41 | 4.73 | 5.35 | 5.66 | 5.83 | 5.82 | 5.85 | 5.80 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 2Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.51 | 7.34 | 8.08 | 8.76 | 9.36 | 9.87 | 10.24 | 10.54 |
| Outperformance vs S&P TDF Index | (1.40) | (1.33) | (1.33) | (1.27) | (1.12) | (0.96) | (0.92) | (0.87) |
| Best Performing Comparator TDF | 9.27 | 10.47 | 11.42 | 11.85 | 12.07 | 12.16 | 12.16 | 12.16 |
| Worst Performing Comparator TDF | 6.96 | 8.01 | 8.77 | 9.73 | 9.82 | 9.93 | 10.01 | 10.19 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 |

| Sharpe Ratio as of 2Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 4 | 4 | 4 | Last | Last | Last | Last | Last |

116.    At this point, during the Class Period, Defendant should have reviewed at least four consecutive quarters of deplorable three- and five-year returns by the BlackRock TDFs when measured against appropriate peer funds and the broader TDF industry. These strong indicators of the imprudence of the continued retention of the BlackRock TDFs should have been sufficient to convince Defendant to investigate a replacement, consistent with the guidance in the

IPS that persistent underperformance is grounds for an investment's termination.[15]  Either trend of underperformance alone should have raised alarm bells for prudent fiduciaries, as was prescribed in the IPS.  That both red flags were present here, but were ignored, demonstrates that Defendant's misconception of TDFs was fatal to its continued review of the suitability of the BlackRock TDFs for the Plan.  Defendant allowed the suite to remain in the Plan even as its performance issues persisted:

- The Committee met on March 26, 2018 to review the Plan's investment results as of the end of the Third Quarter of 2017. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's three- and five-year Plan-asset weighted Sharpe ratios ranked in the 66th and 73rd percentile, respectively, among its peer group. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 3Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.14 | 5.77 | 6.34 | 6.85 | 7.30 | 7.57 | 7.67 | 7.68 |
| Outperformance vs S&P TDF Index | (0.90) | (0.79) | (0.74) | (0.72) | (0.60) | (0.57) | (0.68) | (0.78) |
| Best Performing Comparator TDF | 6.83 | 7.46 | 8.03 | 8.61 | 8.85 | 9.01 | 9.05 | 9.05 |
| Worst Performing Comparator TDF | 5.92 | 6.38 | 7.19 | 7.61 | 7.97 | 8.02 | 8.06 | 8.02 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 3Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.18 | 7.02 | 7.78 | 8.47 | 9.05 | 9.55 | 9.87 | 10.11 |
| Outperformance vs S&P TDF Index | (1.46) | (1.40) | (1.39) | (1.35) | (1.23) | (1.08) | (1.09) | (1.07) |
| Best Performing Comparator TDF | 8.81 | 10.10 | 11.12 | 11.65 | 11.90 | 12.00 | 12.04 | 12.02 |
| Worst Performing Comparator TDF | 6.71 | 7.67 | 8.54 | 9.47 | 9.56 | 9.65 | 9.70 | 9.85 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 |

---

[15]Four quarters of trailing three- or five-year returns is distinct from four quarters of returns.  Plaintiffs note, for example, four consecutive quarters of trailing five-year underperformance to show that, were the Committee meeting on a regular, quarterly basis, it would have reviewed five-year underperformance at four straight separate meetings.  Any trailing three- or five-year underperformance as of a single quarter end is worth a fiduciary's attention; trends such as those detailed in this Complaint are cause for considerable concern.

| Sharpe Ratio as of 3Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | 4 | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 4 | 4 | 4 | Last | Last | Last | Last | Last |

- The Committee met on July 10, 2018 to review the Plan's investment results as of the end of the Fourth Quarter of 2017. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's three- and five-year Plan-asset weighted Sharpe ratios ranked in the 57th and 70th percentile, respectively, among its peer group. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 4Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.66 | 6.48 | 7.21 | 7.89 | 8.48 | 8.85 | 8.97 | 8.96 | 8.96 |
| Outperformance vs S&P TDF Index | (0.82) | (0.72) | (0.66) | (0.62) | (0.47) | (0.39) | (0.52) | (0.66) | (0.74) |
| Best Performing Comparator TDF | 7.41 | 8.11 | 8.75 | 9.56 | 9.89 | 10.09 | 10.16 | 10.15 | 9.68 |
| Worst Performing Comparator TDF | 6.55 | 7.07 | 7.85 | 8.39 | 8.91 | 9.14 | 9.16 | 9.11 | 9.10 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | 4 |

| 5-Year Return as of 4Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.58 | 7.51 | 8.32 | 9.09 | 9.75 | 10.28 | 10.61 | 10.82 |
| Outperformance vs S&P TDF Index | (1.34) | (1.25) | (1.25) | (1.20) | (1.04) | (0.87) | (0.87) | (0.88) |
| Best Performing Comparator TDF | 9.09 | 10.36 | 11.50 | 12.13 | 12.45 | 12.57 | 12.62 | 12.60 |
| Worst Performing Comparator TDF | 7.30 | 8.29 | 9.30 | 10.36 | 10.46 | 10.54 | 10.60 | 10.74 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 |

| Sharpe Ratio as of 4Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | 3 | 4 | 4 | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 4 | Last | 4 | Last | Last | Last | Last | Last | N/A |

- The Committee met on December 5, 2018 to review the Plan's investment results as of the end of the First Quarter of 2018. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's three- and five-year Plan-asset weighted Sharpe ratios ranked in the 65th and 71st percentile, respectively, among its peer group. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 1Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.63 | 5.37 | 6.03 | 6.65 | 7.17 | 7.49 | 7.60 | 7.59 | 7.59 |
| Outperformance vs S&P TDF Index | (0.70) | (0.64) | (0.59) | (0.56) | (0.44) | (0.39) | (0.51) | (0.65) | (0.73) |
| Best Performing Comparator TDF | 6.50 | 7.12 | 7.86 | 8.86 | 9.20 | 9.41 | 9.53 | 9.51 | 9.49 |
| Worst Performing Comparator TDF | 5.62 | 6.06 | 6.83 | 7.35 | 7.86 | 8.10 | 8.11 | 8.05 | 8.06 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 1Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.51 | 6.30 | 6.99 | 7.63 | 8.18 | 8.62 | 8.84 | 8.98 |
| Outperformance vs S&P TDF Index | (1.12) | (1.04) | (1.03) | (1.01) | (0.89) | (0.76) | (0.83) | (0.88) |
| Best Performing Comparator TDF | 7.92 | 8.83 | 9.94 | 10.63 | 10.93 | 11.07 | 11.12 | 11.12 |
| Worst Performing Comparator TDF | 6.31 | 7.12 | 8.07 | 8.97 | 9.04 | 9.09 | 9.14 | 9.21 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| Sharpe Ratio as of 1Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | N/A |

- The Committee met on April 10, 2019 to review the Plan's investment results as of the end of the Second Quarter of 2018 and Third Quarter of 2018. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's three- and five-year Plan-asset weighted Sharpe ratios ranked in the 53rd and 63rd percentile, respectively, and 50th and 67th percentile, respectively, among its peer group. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 2Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.10 | 5.89 | 6.60 | 7.26 | 7.83 | 8.19 | 8.32 | 8.30 | 8.31 |
| Outperformance vs S&P TDF Index | (0.80) | (0.70) | (0.63) | (0.57) | (0.43) | (0.32) | (0.43) | (0.56) | (0.66) |
| Best Performing Comparator TDF | 6.64 | 7.27 | 8.16 | 9.19 | 9.56 | 9.76 | 9.88 | 9.90 | 9.89 |
| Worst Performing Comparator TDF | 6.04 | 6.49 | 7.19 | 7.66 | 8.14 | 8.40 | 8.40 | 8.37 | 8.37 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 2Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.99 | 6.77 | 7.47 | 8.10 | 8.66 | 9.07 | 9.28 | 9.40 | |
| Outperformance vs S&P TDF Index | (0.93) | (0.83) | (0.79) | (0.78) | (0.64) | (0.53) | (0.61) | (0.66) | |
| Best Performing Comparator TDF | 8.06 | 8.89 | 9.86 | 10.61 | 10.91 | 11.06 | 11.15 | 11.12 | |
| Worst Performing Comparator TDF | 6.79 | 7.58 | 8.54 | 9.31 | 9.49 | 9.53 | 9.58 | 9.64 | |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | |

| Sharpe Ratio as of 2Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 4 | Last | Last | Last | Last | Last | Last | Last | N/A |

| 3-Year Return as of 3Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 7.27 | 8.60 | 9.80 | 10.95 | 11.94 | 12.55 | 12.74 | 12.72 | 12.70 |
| Outperformance vs S&P TDF Index | (1.09) | (0.85) | (0.67) | (0.49) | (0.16) | 0.01 | (0.19) | (0.40) | (0.64) |
| Best Performing Comparator TDF | 9.61 | 10.59 | 11.56 | 13.05 | 13.45 | 13.76 | 13.91 | 13.91 | 13.87 |
| Worst Performing Comparator TDF | 8.40 | 9.70 | 10.66 | 11.61 | 12.54 | 12.91 | 12.90 | 12.89 | 12.89 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 3Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.58 | 6.34 | 7.02 | 7.64 | 8.20 | 8.59 | 8.75 | 8.81 | |
| Outperformance vs S&P TDF Index | (0.91) | (0.79) | (0.76) | (0.75) | (0.59) | (0.46) | (0.55) | (0.61) | |
| Best Performing Comparator TDF | 7.32 | 8.01 | 8.98 | 9.79 | 10.08 | 10.26 | 10.35 | 10.32 | |
| Worst Performing Comparator TDF | 6.55 | 7.24 | 8.13 | 8.69 | 9.17 | 9.26 | 9.28 | 9.30 | |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | |

| Sharpe Ratio as of 3Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | N/A |

117.   At this point, consistent with its regular monitoring duties, the Committee should have reviewed at least eight consecutive quarters demonstrating the BlackRock TDFs' persistent inability to beat the three- and five-year returns generated by the Comparator TDFs and the broader TDF industry. That is, from the start of the Class Period, the BlackRock TDFs had failed to generate returns to beat the Comparator TDFs or the S&P Indices for *eight consecutive* three-year periods and *eight consecutive* five-year periods, in addition to similar shortcomings exhibited against Wilshire's custom TDF peer group. The Committee's confounding refusal to

replace the suite by this juncture, despite its clear and apparent noncompliance with the IPS standards, represented a severe breach of fiduciary duty.  These issues endured:

- The Committee met on June 13, 2019 to review the Plan's investment results as of the end of the Fourth Quarter of 2018. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's five-year Plan-asset weighted Sharpe ratio ranked in the 52nd percentile among its peer group. ***No discussion or mention*** of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 4Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.71 | 5.23 | 5.70 | 6.14 | 6.51 | 6.69 | 6.72 | 6.70 | 6.69 |
| Outperformance vs S&P TDF Index | (0.33) | (0.24) | (0.08) | 0.06 | 0.18 | 0.18 | 0.04 | (0.12) | (0.26) |
| Best Performing Comparator TDF | 5.72 | 6.12 | 6.92 | 7.43 | 7.62 | 7.77 | 7.83 | 7.81 | 7.81 |
| Worst Performing Comparator TDF | 5.32 | 5.73 | 6.07 | 6.41 | 6.75 | 6.78 | 6.77 | 6.77 | 6.75 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 4Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 3.70 | 4.00 | 4.27 | 4.51 | 4.70 | 4.80 | 4.82 | 4.81 |
| Outperformance vs S&P TDF Index | (0.40) | (0.32) | (0.24) | (0.18) | (0.12) | (0.11) | (0.19) | (0.26) |
| Best Performing Comparator TDF | 4.69 | 5.00 | 5.63 | 5.95 | 6.05 | 6.17 | 6.19 | 6.17 |
| Worst Performing Comparator TDF | 4.24 | 4.50 | 4.82 | 4.99 | 5.10 | 5.13 | 5.12 | 5.10 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| Sharpe Ratio as of 4Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | 4 | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 3 | Last | Last | Last | Last | Last | Last | Last | N/A |

- The Committee met on September 17, 2019 to review the Plan's investment results as of the end of the First Quarter of 2019. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's five-year Plan-asset weighted Sharpe ratio ranked in the 55th percentile among its peer group. ***No discussion or mention*** of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 1Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.36 | 7.38 | 8.28 | 9.14 | 9.89 | 10.34 | 10.48 | 10.47 | 10.45 |
| Outperformance vs S&P TDF Index | (0.61) | (0.37) | (0.16) | 0.04 | 0.33 | 0.48 | 0.36 | 0.18 | (0.03) |
| Best Performing Comparator TDF | 8.24 | 9.05 | 9.79 | 10.88 | 11.28 | 11.50 | 11.62 | 11.62 | 11.58 |
| Worst Performing Comparator TDF | 7.12 | 8.18 | 8.87 | 9.52 | 10.20 | 10.43 | 10.43 | 10.43 | 10.42 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 | 4 |

| 5-Year Return as of 1Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.70 | 5.26 | 5.75 | 6.19 | 6.57 | 6.80 | 6.89 | 6.88 |
| Outperformance vs S&P TDF Index | (0.57) | (0.40) | (0.31) | (0.22) | (0.09) | (0.00) | (0.07) | (0.14) |
| Best Performing Comparator TDF | 5.93 | 6.41 | 7.12 | 7.77 | 7.98 | 8.12 | 8.19 | 8.18 |
| Worst Performing Comparator TDF | 5.54 | 5.92 | 6.39 | 6.69 | 6.96 | 7.08 | 7.08 | 7.05 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| Sharpe Ratio as of 1Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | N/A |

- The Committee met on December 18, 2019 to review the Plan's investment results as of the end of the Second Quarter of 2019. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's five-year Plan-asset weighted Sharpe ratio ranked in the 57th percentile among its peer group. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 2Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.65 | 7.69 | 8.61 | 9.48 | 10.24 | 10.68 | 10.82 | 10.81 | 10.80 |
| Outperformance vs S&P TDF Index | (0.63) | (0.40) | (0.22) | (0.02) | 0.23 | 0.36 | 0.21 | 0.01 | (0.21) |
| Best Performing Comparator TDF | 8.75 | 9.67 | 10.51 | 11.37 | 11.69 | 11.83 | 11.95 | 11.92 | 11.90 |
| Worst Performing Comparator TDF | 7.27 | 8.39 | 9.39 | 10.09 | 10.79 | 11.05 | 11.03 | 11.04 | 11.03 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 2Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.63 | 5.14 | 5.58 | 5.99 | 6.33 | 6.52 | 6.57 | 6.53 |
| Outperformance vs S&P TDF Index | (0.52) | (0.39) | (0.31) | (0.25) | (0.14) | (0.08) | (0.16) | (0.26) |
| Best Performing Comparator TDF | 5.79 | 6.26 | 6.90 | 7.54 | 7.74 | 7.90 | 7.97 | 7.94 |
| Worst Performing Comparator TDF | 5.48 | 5.82 | 6.22 | 6.48 | 6.72 | 6.86 | 6.85 | 6.82 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| Sharpe Ratio as of 2Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 4 | Last | Last | Last | Last | Last | Last | Last | N/A |

- The Committee met on March 26, 2020 to review the Plan's investment results as of the end of the Third Quarter of 2019. A fiduciary prudently monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe actual and risk-adjusted performance issues compared to both the Comparator TDFs and the S&P Indices. In addition, the suite's five-year Plan-asset weighted Sharpe ratio ranked in the 50th percentile among its peer group. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 3Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.25 | 7.05 | 7.74 | 8.40 | 8.96 | 9.28 | 9.37 | 9.37 | 9.35 |
| Outperformance vs S&P TDF Index | (0.47) | (0.31) | (0.19) | (0.06) | 0.13 | 0.21 | 0.08 | (0.06) | (0.26) |
| Best Performing Comparator TDF | 7.59 | 8.28 | 9.22 | 10.04 | 10.04 | 10.12 | 10.21 | 10.19 | 10.16 |
| Worst Performing Comparator TDF | 6.66 | 7.52 | 8.29 | 8.78 | 9.28 | 9.41 | 9.42 | 9.41 | 9.41 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 3Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.22 | 5.73 | 6.16 | 6.56 | 6.90 | 7.09 | 7.15 | 7.15 |
| Outperformance vs S&P TDF Index | (0.47) | (0.37) | (0.31) | (0.26) | (0.17) | (0.12) | (0.19) | (0.26) |
| Best Performing Comparator TDF | 6.27 | 6.74 | 7.16 | 7.75 | 7.95 | 8.09 | 8.14 | 8.13 |
| Worst Performing Comparator TDF | 5.80 | 6.33 | 6.67 | 6.92 | 7.15 | 7.23 | 7.24 | 7.21 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| Sharpe Ratio as of 3Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock 3-Year Rank (out of 5) | 4 | Last | Last | Last | Last | Last | Last | Last | Last |
| BlackRock 5-Year Rank (out of 5) | 3 | 4 | Last | Last | Last | Last | Last | Last | N/A |

118. By this point, consistent with their regular monitoring duties, beginning with the start of the Class Period, Defendant should have reviewed at least *three and a half years'* worth of concerning datapoints (and many more datapoints prior to the Class Period) laying bare the inability of the BlackRock TDFs to generate returns that beat *any* of the comparators discussed in this Complaint and material under the Plan's IPS. Defendant's continued refusal to act in

response to these blatant warning signs, in defiance of the instruction from the fiduciary training provided to Committee members that fiduciaries must apply additional scrutiny in their ongoing assessment of the QDIA, represented a bewildering miscarriage of its fiduciary duties.

119.    Although the BlackRock TDFs' risk-adjusted returns exhibited some modest improvements in subsequent quarters, those modest improvements were immaterial and did not negate or diminish the profound breaches of fiduciary duty Defendant committed in retaining the suite in the face of overwhelming and consistent evidence that it could not provide superior returns, on an absolute or risk-adjusted basis, than the Comparator TDFs, the S&P Indices, or the broader TDF market.  Nor did those minor improvements make up for Plan participants' loss of tens of millions of dollars in potential capital appreciation.  Any suggestion that the performance of the BlackRock TDFs marginally improved in the later part of the Class Period cannot excuse the Committee's abject failure to monitor the performance of the BlackRock TDFs in a manner consistent with the IPS at the front end of the Class Period.  To do so would inappropriately exonerate a breach through hindsight analysis.  Moreover, the BlackRock TDFs continued to dramatically and repeatedly underperform the average return of the Comparator TDFs for virtually the entire relevant period, as demonstrated in the charts below comparing the three- and five-year annualized returns of several representative vintages of the BlackRock TDFs to those of the same iterations of the Comparator TDFs, namely the 2025, 2040, and 2055 TDFs, which are the second-shortest dated (2025) and second-longest dated (2055) BlackRock TDFs, as well as the fund that represents the midpoint of the nine vintages for which there were at least three-year trailing returns (2040).  These three vintages represent conservative, moderate and aggressive stages along the BlackRock TDF glidepath and are representative of the shortcomings of the entire suite.

- 57 -





120.    These returns, and all returns cited in this Complaint, are annualized, meaning the differences in the returns between the BlackRock TDFs and Comparator TDFs are equivalent to the specified difference in *each* of the three or five years in the period *compounded*.  This is not the same as saying the funds underperformed by the specified amount over the entire time period.  These are persistent and substantial shortcomings that could not have supported a

determination by prudent fiduciaries that the BlackRock TDFs could be justifiably retained in the Plan, particularly not fiduciaries instructed to consider those very deficiencies in determining whether an investment remained in compliance with the standards enumerated in the Plan's IPS. Indeed, from the start of the Class Period through the filing of the complaint initiating this action, the BlackRock TDFs *cumulatively* underperformed each of the comparator TDFs (on a Plan-asset weighted basis) by the below amounts which, applied to the considerable amount of Plan assets in the suite, resulted in the loss of dozens of millions in missed capital appreciation for the retirement savings of Plan participants:

| | |
|---|---|
| BlackRock Cumulative Underperformance vs American Funds | 11.90% |
| BlackRock Cumulative Underperformance vs Freedom Index Funds | 4.95% |
| BlackRock Cumulative Underperformance vs T. Rowe Price | 9.08% |
| BlackRock Cumulative Underperformance vs Vanguard | 2.83% |

121.    Again, the above information was readily obtainable and calculable by Defendant in real time throughout the relevant period.  Defendant, however, neglected to undertake any analysis of the BlackRock TDFs against appropriate peers using the above or other important performance metrics due to a fatal misunderstanding of the suite's management characteristics. If Defendant had taken its fiduciary duties seriously during the Class Period, it would have replaced the BlackRock TDFs with a suitable alternative TDF.  Defendant's failure to do so caused Plan participants to miss out on substantial investment returns for their retirement savings.

122.    The consistently deplorable performance of the BlackRock TDFs was also visible at the suite level throughout the pertinent period.  The below charts demonstrate the rolling out- or underperformance of the BlackRock TDFs versus each of the Comparator TDFs, weighting the returns of each distinct vintage equally to produce an aggregate suite-level return, another form of TDF analysis regularly undertaken by all investment advisors and competent fiduciaries.

<u>BlackRock Rolling Returns vs American Funds</u>





BlackRock Rolling Returns vs Fidelity Freedom Index





BlackRock Rolling Returns vs T. Rowe Price





BlackRock Rolling Returns vs Vanguard





123.    The returns of each vintage of a TDF series, however, are not experienced by a Plan in equal measure, as Plan assets are distributed in different quantities across the glide path depending on a multitude of Plan specific factors.  Accordingly, prudent fiduciaries will perform the same analysis as set forth above to compare aggregate series-level returns that are asset-

weighted.[30]

<u>BlackRock Rolling Returns vs American Funds</u>





---

[30]Returns are weighted according to the asset levels invested in each vintage of the BlackRock TDFs at the beginning of the Class Period.  For example, if the Plan had $100 million in total assets in the BlackRock TDFs, $10 million of which was invested in the 2030 vintage, the returns of the 2030 vintage would be given a 10% weight in the performance composite.

BlackRock Rolling Returns vs Fidelity Freedom Index





BlackRock Rolling Returns vs T. Rowe Price





BlackRock Rolling Returns vs Vanguard





124.    Defendant had immediate access to historical and then-current returns data for the BlackRock TDFs, and could have sought comparative data from Wells Fargo or Wilshire and/or the Plan's other service providers, or obtained it itself in real time through just a few clicks of a computer mouse.

125.    The troubling pattern identified above, which persisted for the entire Class Period,

was ignored by Defendant, who neglected to appropriately scrutinize the BlackRock TDFs against any of the many superior TDFs available in the market, or the broader TDF market as a whole. In fact, notwithstanding the warning signs detailed above, the minutes of meetings of the Committee from March 27, 2017 through September 27, 2022 do not reflect a single instance where the Committee so much as independently discussed the performance woes of the BlackRock TDFs.

126. The knowable facts about Defendants' fiduciary process, including the Committee's consistent failure to recognize, investigate, and remedy repeated failures of the only material investment monitoring criteria adopted in the Plan's own IPS and failure to recognize, incorporate and scrutinize further material data furnished by its advisor when presented with investment monitoring information, each support the inescapable inference that Defendants' fiduciary process was inadequate

127. Had Defendants taken their fiduciary duties seriously during the Class Period and acted consistent the minimum fiduciary standards of care and the instructions of the Plan's IPS, they would have, upon observing the underperformance of the BlackRock TDFs relative to the TDF universe and specific readily investable peers, replaced the BlackRock TDFs with a suitable alternative TDF suite. The Committee's failure to do so caused Plan participants to miss out on substantial investment returns for their retirement savings.

## V.      ERISA'S FIDUCIARY STANDARDS

128. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as a fiduciary of the Plan. Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -

     (A)     for the exclusive purpose of

          (i)     providing benefits to participants and their beneficiaries; and

          (ii)     defraying reasonable expenses of administering the plan;

     [and]

     (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

129.    Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

130.    Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

131.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982).

132.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 405(a) of ERISA, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>     (1)    if he participates knowingly in, or knowingly undertakes to

conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)    if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

133.    Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA provides, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.    CLASS ALLEGATIONS

134.    This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed Class:

All participants and beneficiaries in the Stanley Black & Decker Retirement Account Plan at any time on or after July 29, 2016 and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just, including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendant and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

135.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

136.    **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

137.    **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)    Whether Defendant failed and continue to fail to discharge its duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)    Whether Defendant breached its fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)    Whether and what form of relief should be afforded to Plaintiffs and the Class.

138.    **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all the members of the Class.  Plaintiffs' claims and all the Class members' claims arise out of the same uniform course of conduct by Defendant and arise under the same legal theories that are applicable as to all other members of the Class.  In addition, Plaintiffs seek relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

139.    **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with other members of the Class or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

140.    **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or

- 71 -

varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

141.    **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

142.    **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendant's breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendant, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

143.    **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

144.    Defendant has acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

145.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

146.    Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

**COUNT I**
**(For Breach of Fiduciary Duty)**

147.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

148.    Defendant's conduct, as set forth above, violates its fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendant failed and continue to fail to discharge its duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to

monitor other fiduciaries of the Plan in the performance of their duties.

149.    To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they, or it was a co-fiduciary and knowingly participated in, or concealed, a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their, or its specific responsibilities giving rise to his, her, their, or its fiduciary status, or knowingly failed to cure a breach of fiduciary duty by another fiduciary and failed to take reasonable efforts to remedy the breach.

150.    As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

151.    Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs, and other recoverable expenses of litigation.

### COUNT II
**(Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)**

152.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

153.    Stanley Black & Decker is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

154.    In light of its appointment and supervisory authority, Stanley Black & Decker had a fiduciary responsibility to monitor the performance of the Committee and its members.  In

addition, Stanley Black & Decker and the Administrative Committee had a fiduciary responsibility to monitor the performance of the members of the Committee.

155.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

156.   To the extent that fiduciary monitoring responsibilities of Stanley Black & Decker or the Committee was delegated, their monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

157.   Stanley Black & Decker and the Committee breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

158.   As a consequence of these breaches of the fiduciary duty to monitor, the Plan

suffered substantial losses. Had Stanley Black & Decker and the Committee discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

159.    Defendant is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

160.    Each of the Plan fiduciaries also knowingly participated in the breaches of the other fiduciaries, knowing that such acts constituted breaches; enabled the other fiduciaries to commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other fiduciaries and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendant, thus, is liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendant for the following relief:

(a)    Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(b)    Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Amended Class Action Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: September 5, 2023                        Respectfully submitted,

/s/ Laurie Rubinow
James E. Miller
Laurie Rubinow
Miller Shah LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
         lrubinow@millershah.com

James C. Shah
Alec J. Berin
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
         ajberin@millershah.com

Anna K. D'Agostino
Miller Shah LLP
225 Broadway, Suite 1830

- 78 -

New York, NY 10007
Telephone: 866-540-5505
Facsimile: 866-300-7367
Email: akdagostino@millershah.com

*Attorneys for Plaintiffs, the Plan,*
*and the Proposed Class*