### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES KISTLER and LISA LANG,<br>    Plaintiffs,<br><br>            v.<br><br>STANLEY BLACK & DECKER, INC.,<br>    Defendant. | No. 3:22-cv-966 (SRU) |

### ORDER ON MOTION TO DISMISS THE AMENDED COMPLAINT

Plaintiffs James Kistler and Lisa Lang bring this action on behalf a potential class of participants and beneficiaries of a retirement plan, the Stanley Black & Decker Retirement Account Plan ("Plan"). Doc. No. 85 at ¶ 1. The plaintiffs claim that Stanley Black & Decker, Inc. ("Stanley Black & Decker") breached its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. Stanley Black & Decker has filed a motion to dismiss the action in its entirety for lack of standing and failure to state a claim. Doc. No. 95. For the reasons set forth below, that motion is **denied**.

### I.    Background

The Plan is a defined-contribution retirement plan. Doc. No. 85 at ¶ 17. Defined-contribution plans are common employer-sponsored retirement plans. Although "earnings on investments increase retirement income" in a defined-contribution plan, the "fees and expenses paid by the plan can substantially reduce retirement income." *Probst v. Eli Lilly & Co*., 2023 WL 1782611, at *2 (S.D. Ind. Feb. 3, 2023) (citations omitted).

In this case, the plaintiffs bring two claims against Stanley Black & Decker: breach of fiduciary duties under ERISA and failure to monitor fiduciary and co-fiduciary breaches. Doc. No. 85 at 73-76. Specifically, the plaintiffs challenge the Plan's excessive recordkeeping and

administrative costs ("RK&A" fees), as well as the Plan's investment in the BlackRock LifePath Index Funds. The plaintiffs specifically bring claims challenging conduct that occurred between July 29, 2016 and the present. *See* Doc. No. 85 at ¶ 10.

A. Investment in the BlackRock TDFs

Regarding the Plan's allegedly imprudent investment in the BlackRock LifePath Index Funds ("BlackRock TDFs"), the plaintiffs allege that the Plan has offered ten BlackRock TDFs since 2011. *Id*. at ¶ 68. The Plan designated the BlackRock TDFs as the plan's Qualified Default Investment Alternative ("QDIA"), meaning that if participants do not choose where to invest their assets, all contributions are automatically invested in the BlackRock TDFs. *Id*. at ¶ 72. Thirty-nine percent of the Plan's assets are invested in the BlackRock TDFs. *Id*. at ¶ 73.

The plaintiffs begin with their premise that "no TDF is a passively managed investment." *Id*. at 26 (cleaned up). Individual funds, they argue, can be actively or passively managed. *Id*. at ¶ 75. A TDF, on the other hand, "is a fund of funds," with a portfolio of actively and/or passively managed funds, and the managers of the TDF make "active" decisions regarding asset allocation. *Id*.; *see also id.* at ¶ 76 ("construction of a glide path involves substantial decision making from TDF managers"). The BlackRock TDFs "are recognized as having 'passive implementation' because the portfolio is filled with index funds." *Id*. at ¶ 76. But the plaintiffs allege that the TDFs themselves are not "passively managed." *Id.*

During the class period, Stanley Black & Decker had an Investment Policy Statement ("IPS") "containing guidelines for the selection, evaluation, and monitoring of Plan investment options." *Id*. at ¶ 22. An IPS, once adopted by fiduciaries, is binding. *Id*. at ¶ 23. The plaintiffs criticize the Plan's IPS guidelines for comparing BlackRock TDFs to their custom benchmark. *Id*. at ¶ 77. "Using this custom benchmark is akin to looking in a mirror, and provides no basis to

conclude anything, positive or negative, about the BlackRock TDFs' performance." *Id*. The custom benchmark, the plaintiffs contend, did not adequately capture the BlackRock TDFs' underperformance relative to their peers. *Id*. Separately, the plaintiffs allege that the IPS establishes that the investment performance of actively managed funds should be "evaluated over three- and five-year periods" and compared to "a relevant peer group of similar funds." *Id*. at ¶¶ 79, 82. The plaintiffs posit that the defendant did not conduct that analysis because they mistakenly characterized the BlackRock TDF as passively managed. *Id*. at ¶ 82.

The plaintiffs state that Wilshire's investment reports ("Wilshire Reports"), reports produced for Stanley Black & Decker by an investment consultant, did, however, compare the performance of the BlackRock TDFs to peers. *Id*. at ¶ 81. The plaintiffs, however, allege that "[t]here is no evidence that the [Stanley Black & Decker, Inc. Pension Operating] Committee ever considered, discussed, or analyzed this comparative data." *Id*. Using the minutes of the Stanley Black & Decker, Inc. Pension Operating Committee (the "Committee") as a reference, the plaintiffs allege that each time the Committee met quarterly beginning from the third quarter of 2016 through the fourth quarter of 2018, the Committee did not discuss or mention the performance of the BlackRock TDFs. *Id*. at ¶¶ 82-99. The omission was notable because, during each those respective quarters, the Wilshire Report showed that the BlackRock TDFs underperformed relative to the median of their peers over three- and five-year periods. *Id*. at ¶¶ 82, 83-99.

The plaintiffs argue that prudent fiduciaries would have compared the performance of the BlackRock TDFs to the S&P Target Date Indices and to similar, alternative TDFs. *Id*. at ¶ 101. Regarding the S&P Target Date Indices, the plaintiffs allege that those indices are "the most common benchmark used to approximate the overall performance of the TDF industry,"

according to Morningstar, an investment analyst firm. *Id*. at ¶ 101. Regarding the similar, alternative TDFs, the plaintiffs posit that the proper comparator TDFs are the other five largest TDF series (BlackRock TDF being one of the six largest TDFs). *Id*. at ¶¶ 105-07. The six largest TDFs "managed approximately three-quarters of all TDF assets." *Id*. at ¶ 106. The plaintiffs argue that any other TDFs would be inapt comparators because those funds would have much smaller assets under management and would accordingly never be a viable investment alternative for the Plan. *Id*. at ¶ 105. The other five largest TDFs are Vanguard Target Retirement, T. Rowe Price Retirement, American Funds Target Retirement, Fidelity Freedom, and Fidelity Freedom Index. *Id*. at ¶ 106. The plaintiffs contend that four out of those five TDFs are proper comparators—they exclude Fidelity Freedom because the funds "under[went] a strategy overhaul in 2014" and "lost considerable assets and market share" as a result, making them an unsuitable comparator. *Id*. at ¶ 107; *id*. at ¶ 107 n.22.

All of the plaintiffs' suggested comparators are "through" glidepaths, while BlackRock TDF is a "to" glidepath. *Id*. at ¶ 109. "To" glidepaths reduce risk "at a quicker pace than most of the Comparator TDFs." *Id*. To account for that variable, the plaintiffs provide a chart comparing the percentage of each comparator's portfolio in equities (*i.e.*, how risky or conservative a portfolio is) for several vintages. *Id*. at 42 ¶ 109. The chart shows that the only vintages in which the BlackRock TDFs were substantially lower-risk than the comparators were the vintages approaching retirement. *Id*. For the vintages 2045 through 2030 (for investors retiring in those years), the BlackRock TDFs did not significantly differ from the comparators in riskiness. *Id*. at ¶ 110. And in the later vintages (for investors retiring later), the BlackRock TDFs were riskier (*i.e.*, more aggressive) than the comparators. *Id*. at ¶¶ 109-110.

4

In further support of the adequacy of their comparators, the plaintiffs write that "[t]he Sharpe ratio metric, a common component of a fiduciary investment monitoring, accounts for differing levels of risk by measuring the performance of an investment, such as a TDF, compared to the performance of similar investments, after adjusting for risk." *Id*. at ¶ 112. The plaintiffs thus contend that using the Sharpe ratio allows for comparing the performance of TDFs across management styles, such as comparing "to" and "through" TDFs. *Id*.

The plaintiffs allege that Stanley Black & Decker's representatives should have observed and discussed the BlackRock TDFs' repeated underperformance relative to those alternative TDFs, yet the Committee's minutes do not show such discussions. *Id*. at ¶ 113. The Sharpe Ratio three- and five-year rankings, as well as the three- and five-year annualized returns of the BlackRock TDFs, were available during each quarter between 2016 and 2022. *Id.* at 47-56 ¶¶ 115-17; *see also id.* at 58, 60-67. Compared to the plaintiffs' comparators, the plaintiffs allege that the BlackRock TDFs consistently performed below average, and almost always last, among all competitors in the quarters between 2016 and 2019. *See id*. at 47-56 ¶¶ 115-17. The plaintiffs further allege that "[t]hese returns . . . are annualized, meaning the difference in the returns between the BlackRock TDFs and Comparator TDFs are equivalent to the specified difference in *each* of the three or five years in the period *compounded*. This is not the same as saying the funds underperformed by the specified amount over the entire time period." *Id*. at ¶ 120. The plaintiffs additionally allege that the BlackRock TDFs consistently underperformed all comparators at the suite-level.[1] *See id*. at 59-67, ¶¶ 122-23.

Despite what the plaintiffs contend is obvious underperformance, the plaintiffs allege that the "minutes of meetings of the Committee from March 27, 2017 through September 27, 2022 do

---

[1] To draw conclusions about the performance of the Blackrock TDFs across the entire suite, that is across all BlackRock TDF vintages, the plaintiffs allege that they "weight[ed] the returns of each distinct vintage equally to produce an aggregate suite-level return." Doc. No. 85 at ¶ 122.

not reflect a single instance where the Committee so much as independently discussed the performance woes of the BlackRock TDFs." *Id*. at ¶ 125.

B. <u>Recordkeeping and Administrative Expenses</u>

The plaintiffs claim that the Plan paid excessive RK&A fees. During the Class Period, Plan participants "paid Wells Fargo for RK&A services through direct charges to their accounts." Doc. No. 85 at ¶ 51. Plan "participants were charged a $12.25 quarterly 'recordkeeping fee,' or $49 annually per participant," for those services. *Id*. at ¶ 55. According to the plaintiffs, the services were "standard services" and "the same as those provided to comparable plans." *Id*. at ¶ 52. Department of Labor ("DOL") regulations require Wells Fargo to disclose to the representatives of Stanley Black & Decker (the "Committee") the types of services it was providing. *Id*. at ¶ 53.

The plaintiffs allege that "for large plans like the Plan, any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan." *Id*. at ¶ 54. That is because, for large plans, recordkeepers offer an "overall suite of recordkeeping services" as part of a "bundled' arrangement" that includes essential services needed by all large plans. *Id*. at ¶¶ 35-36. Those services are "offered by all recordkeepers" at a set price, ordinarily a per capita rate. *Id*. There are additional services that recordkeepers can provide, what the plaintiff calls "A La Carte RK&A" services, but those are charged only to individual participants and are separate from the standard RK&A fees at issue in this case. *Id*. at ¶ 37.

The plaintiffs set forth 31 defined-contribution plans as comparators. *Id.* at 20 ¶ 58. The plaintiffs allege that the plans "received at least the same RK&A services as the Plan." *Id*. at

¶ 61. The plaintiffs allege that "publicly available data and information from the participant fee disclosures and Form 5500 filings[2] of similarly sized defined-contribution plans during the Class Period" show that the similar plans "were paying much lower fees than the Plan throughout the Class Period." *Id*. at ¶ 57. The Plan has 19,253 participants, and the comparators proposed by the plaintiffs have between 5,235 and 47,358 participants. *Id*. at 20 ¶ 58. The list of the plans, arranged from fewest participants to most participants, shows a clear, inverse correlation between the size of the plan and per-participant RK&A fee charged. *Id*.; *see also* 21 ¶ 59. Almost all the plans that had between 6,266 participants and 47,358 participants paid lower fees per participant than the Plan did. *Id*. Narrowing in on the plans closest in size to the Plan, almost every plan with between 12,000 and 25,000 participants paid RK&A fees of at most $35 per participant, whereas the Plan paid $50 per participant. *Id.* at ¶ 57.

To further their argument that the fees were excessive, the plaintiffs also compared RK&A fees that the Plan paid in different years. The plaintiffs show that the fees charged per Plan participant for RK&A fees between 2016 and 2020 remained largely the same, despite fluctuations in the Plan's participant numbers during that timeframe. *Id*. at 19 ¶ 55.

The plaintiffs allege that "the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration," should have resulted in "reasonable rates for RK&A services that were significantly lower" than the rates the Plan participants ultimately paid. *Id*. at ¶ 56. "The impact of such high fees on participant balances," the plaintiffs contend, "is aggravated by the effect of compounding, to the significant detriment of participants over

---

[2] Form 5500s are public reports produced by employee benefit plans "to satisfy annual reporting requirements under ERISA and the Internal Revenue Code." *Form 5500 Corner*, IRS, *available at* https://www.irs.gov/retirement-plans/form-5500-corner# (last accessed June 27, 2024). Form 5500s are accessible through an online search tool. *See Form 5500 Search*, EFAST, https://www.efast.dol.gov/5500Search (last accessed June 27, 2024).

time." *Id*. at ¶ 50. The plaintiffs thus argue that the high fees support the inference that the defendant breached its fiduciary duty.

In addition to alleging relatively high fees, the plaintiffs further allege that the defendant's process in contracting for those recordkeeping services was deficient. The plaintiffs allege that the DOL recognized in "2010 that prudent plan fiduciaries normally conduct requests for proposal (the most formal type of competitive bidding) every three to five years." *Id*. at ¶ 63. The plaintiffs, however, allege that the defendant did not conduct any competitive bidding during the Class Period to ensure that Plan participants were charged reasonable fees. *Id*. at ¶¶ 63-64. Furthermore, the plaintiffs allege that the defendant did not "conduct any investigation or examination into the appropriateness of the Plan's fees" during the Class Period, apart from a singular, flawed benchmarking study in 2022. *Id*. at ¶ 65. The plaintiffs argue that the 2022 benchmarking study, produced for the Plan by Wilshire, was flawed because it compared recordkeeping fees to total assets in the Plan, rather than comparing recordkeeping fees to number of participants. *Id*. at ¶ 66.

Accordingly, the plaintiffs argue that Stanley Black & Decker breached its fiduciary duties by permitting the Plan participants to be overcharged for RK&A fees, resulting in a loss of "millions of dollars in their retirement savings." *Id.* at ¶ 67.

## II.     Standard of Review

### A.     Rule 12(b)(6) Standard

"When deciding a motion to dismiss under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief." *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 121 (D. Conn. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S.

8

662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). However, "[w]here a conclusory allegation in the complaint conflicts with a statement made in a document attached to the complaint, the document controls and the allegation is not accepted as true." *Francis v. Carusso*, 2022 WL 16716172, at *10 (D. Conn. Nov. 4, 2022) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 607 F. Supp. 2d 500, 502 (S.D.N.Y. 2009)). Additionally, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and a plaintiff's "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A. Rule 12(b)(1) Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *see* Fed. R. Civ. P. 12(b)(1). To survive a motion brought under Rule 12(b)(1), a plaintiff "has the burden of proving by a preponderance of the evidence that [subject matter jurisdiction] exists." *McArthur v. Nail Plus*, 2022 WL 1605538, at *1 (D. Conn. May 20, 2022) (quoting *Makarova*, 201 F.3d at 113); *see also Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994). "In adjudicating a Rule 12(b)(1) motion, the Court is not limited to the pleadings, but may instead consider all evidentiary material bearing on whether it has subject matter jurisdiction." *Young Advocs. for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 229-30 (E.D.N.Y. 2019) (citing *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)).

### III.   Discussion

The plaintiffs bring two overarching claims in their amended complaint: breach of fiduciary duties under ERISA and failure to monitor fiduciary and co-fiduciary breaches. Doc. No. 85 at 73-76.

Stanley Black & Decker moves to dismiss the plaintiffs' amended complaint on the following grounds: failure to state a claim of breach of duty of prudence, failure to state a claim of breach of fiduciary duty for recordkeeping fees, lack of standing, failure to state a claim of breach of duty of loyalty, and failure to state a claim of failure to monitor. *See* Doc. No. 95; Doc. No. 96.

### A.   Judicial Notice and Documents Incorporated by Reference

Stanley Black & Decker attaches well over 1000 pages of exhibits to its motion to dismiss. *See* Docs. No. 97, 98, 99, 105-1-105-19. A district court may consider certain extrinsic materials without converting a motion to dismiss into one for summary judgment.[3] Those materials include matters of which judicial notice may be taken, *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in the complaint by reference, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted); or any document that is not attached or incorporated by reference "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint," *id.* at 153 (citation and internal quotation marks omitted). To satisfy the latter category, "the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint."

---

[3] Extrinsic materials that are considered "outside the pleadings," however, cannot be considered without "convert[ing] the motion [to dismiss] to one for summary judgment and giv[ing] the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002).

*DeLuca v. AccessIT Grp., Inc*., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (cleaned up and quoting *Chambers*, 282 F.3d at 153). "[T]he Court's consideration of documents incorporated by reference in or deemed integral to the complaint is discretionary, not required." *SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd*., 2023 WL 3919450, at *2 (S.D.N.Y. Mar. 15, 2023) (citing *Goel v. Bunge, Ltd*., 820 F.3d 554, 559 (2d Cir. 2016); *Remcoda, LLC v. Ridge Hill Trading (PTY) Ltd*., 2022 WL 603998, at *11 (S.D.N.Y. Mar. 1, 2022)).

Form 5500s are documents of which a court may take judicial notice. *See Kramer v. Time Warner Inc*., 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents . . . ."). Accordingly, pursuant to the doctrine of judicial notice, I will consider publicly filed Form 5500s, including those that have been attached as exhibits to filings in this case.

Additionally, the plaintiffs' amended complaint either incorporates by reference or heavily relies on several extrinsic documents. Those documents include the Plan's IPS, the Committee's meeting minutes, the Committee's meeting agenda, and the Wilshire Reports regarding investment performance. *See, e.g.*, Doc. No. 85 at ¶¶ 66, 84-98, 113, 115-117. In addition to relying on those documents in their amended complaint and briefings, the plaintiffs also expressly called on the Court to consider certain of those documents during the most recent hearing on the instant motion. *See* Doc. No. 118 at 29-30, 37, 47. I will thus consider those documents as either incorporated by reference or "integral to the complaint." *See Collins v. City of New York*, 156 F. Supp. 3d 448, 455 n.4 (S.D.N.Y. 2016).

Apart from the documents incorporated into the pleadings as set forth above, I will not consider the extrinsic documents submitted by Stanley Black & Decker when ruling on the instant motion to dismiss.

B. Article III Standing

Stanley Black & Decker argues that the plaintiffs lack Article III standing to bring claims regarding funds in which the named plaintiffs were not investors. Specifically, Stanley Black & Decker argues that the plaintiffs lack standing to challenge "the entire suite of BlackRock TDFs," or eight of the nine funds targeted by the plaintiffs. *See* Doc. No. 96 at 40. Stanley Black & Decker contends that the named plaintiffs only invested in the BlackRock 2030 TDF, so they did not suffer an injury with respect to the TDFs in which they did not invest. *Id*.

"Article III standing requires a party to show that (1) the party has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and conduct complained of; and (3) it is likely that a favorable decision in the case will redress the injury." *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 264 (S.D.N.Y. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" as an injury-in-fact, "for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S at 561 (internal quotation marks and citation omitted).

The Plan is a defined-contribution plan. *See* Doc. No. 85 at ¶ 3. "[D]istrict courts in this Circuit have taken two divergent approaches to Article III standing in ERISA cases [brought in a derivative capacity] when plaintiffs allege injuries due to deficient management or performance of funds in defined-contribution plans." *Garthwait v. Eversource Energy Co.*, 2021 WL 4441939, at *5 (D. Conn. Sept. 28, 2021). The root of that divergence is a disagreement regarding the applicability of the Second Circuit case *Head Start* to defined-contribution plans. *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., In*c. ("*Head Start*"), 710 F.3d 57 (2d Cir. 2013); *see Garthwait*, 2021 WL 4441939, at *5. *Head Start*

held that plaintiff participants in a defined-benefits plan who "asserted their claims in a derivative capacity, to recover for injuries to the Plan caused by the Administrators' breach of their fiduciary duties" had satisfied the injury-in-fact requirement for Article III standing. *Head Start*, 710 F.3d at 67 n.5. Some courts have applied *Head Start* to hold that plaintiff participants in defined-contribution plans may similarly assert their claims in a derivative capacity. *See, e.g.*, *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 155 (S.D.N.Y. Nov. 27, 2017). Other courts have held that *Head Start* does not apply to defined-contribution plans, and plaintiff participants in those plans "can only demonstrate a constitutionally sufficient injury by pointing to [their] *individual account's specific losses* during the class period." *In re UBS Erisa Litig.*, 2014 WL 4812387, at *6 (S.D.N.Y. Sept. 29, 2014).

Stanley Black & Decker advocates for the latter approach. In arguing that the plaintiffs have not established standing for the funds in which they did not invest, Stanley Black & Decker relies on *Patterson v. Morgan Stanley*. *See* Doc. No. 96 at 41; *Patterson v. Morgan Stanley*, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019). In that case, the court held that plaintiffs did not have standing to bring claims regarding seven of the thirteen challenged funds because they had not invested in those funds. The court stated that "[l]osses incurred by funds in which Plaintiffs did not invest cannot have impaired the value of Plaintiffs' individual accounts." *Patterson*, 2019 WL 4934834, at *5. Further, "[t]he mere fact that Plaintiffs purport to bring this action in a derivative capacity does not absolve them of the need to establish a constitutional injury-in-fact on the basis of the poor performance of the Non-Selected Funds." *Id*. The *Patterson* court additionally held that "the mere fact that Plaintiffs have brought this suit as a putative class action is insufficient to provide them with Article III standing to bring claims regarding the Non-Selected Funds." *Id*. at *6.

In *Falberg v. Goldman Sachs Group*, relied on by the plaintiffs, the court referred to *Patterson* "an outlier" in its interpretation of standing for ERISA class actions. 2020 WL 3893285, at *8 (S.D.N.Y. July 9, 2020) (collecting cases). *Falberg* explained that a majority of courts are instead consistent with *Leber*. *Id* (collecting cases); *see also Leber*, 323 F.R.D. at 155 ("[T]he holding of *Long Island Head Start* remains binding on this Court.").[4] Additionally, a court within this district also endorsed *Leber*'s application of *Long Island Head Start* to defined-contribution plans. *See Vellali v. Yale Univ.*, 333 F.R.D. 10, 16 (D. Conn. 2019).

In *Garthwait*, another court within this district applied a middle-ground approach, which requires first that the named plaintiffs "show[] that they have suffered personal injuries-in-fact," such as by "identif[ying] individualized losses in specific investment funds stemming from the defendants' alleged breaches of fiduciary duty." *Garthwait v. Eversource Energy Co.*, 2022 WL 1657469, at *8 (D. Conn. May 25, 2022). Second, the named plaintiffs must "show[] that the putative class members face the 'same set of concerns' as the putative class representatives." *Id*. If the named plaintiffs meet both requirements, they have standing to bring all the claims on behalf of their class. *Id*.

I will apply *Garthwait*'s approach to the plaintiffs' claims. The plaintiffs here set forth facts regarding which specific funds the named plaintiffs invested in, and they also allege that they were subjected to the allegedly high RK&A fees. *See* Doc. No. 85 at ¶¶ 8-9; *see also id*. at ¶¶ 50, 120 (additional allegations regarding general loss). *Cf. Garthwait*, 2021 WL 4441939, at *6 (ruling on motion to dismiss the first complaint in *Garthwait*, in which the court held the plaintiffs lacked standing because the plaintiffs had not alleged whether the named plaintiffs had invested in *any* of the funds at issue). Thus, for the pleading stage, the named plaintiffs have

---

[4] *Leber* had distinguished *Taveras*, a non-precedential order by the Second Circuit that had called into question the applicability of *Head Start* to defined-contribution plans. *See* 323 F.R.D. at 155 (distinguishing *Taveras v. UBS AG*, 612 F. App'x 27 (2d Cir. 2015)).

alleged enough facts showing which funds they invested in and supporting the inference that they suffered individualized losses. Furthermore, the named plaintiffs have plausibly alleged that they face the same set of concerns as the class members. *See* Doc. No. 85 at ¶¶ 134-146 (plaintiffs' class allegations).

Accordingly, the plaintiffs have alleged enough for the pleading stage to establish standing to bring claims regarding funds in which the named plaintiffs did not invest.

## C. ERISA Fiduciary Duties Claims

The plaintiffs assert ERISA claims against Stanley Black & Decker for breach of fiduciary duty and for failure to monitor other fiduciaries. *See* Doc. No. 85 at 73-76. Stanley Black & Decker moves to dismiss the plaintiffs' ERISA fiduciary duties claims for failure to state a claim.

"The central purpose of ERISA is 'to protect beneficiaries of employee benefit plans.'" *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63 (2d Cir. 2016) (quoting *Slupinski v. First Unum Life Ins. Co*., 554 F.3d 38, 47 (2d Cir. 2009)). "Congress intended that private individuals would play an important role in enforcing ERISA's fiduciary duties—duties which have been described as 'the highest known to the law.'" *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Plaintiffs in ERISA cases, however, "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc*. ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013) (citation omitted).

To survive a motion to dismiss, ERISA plaintiffs nevertheless must meet the pleading standards established in *Twombly* and *Iqbal*. *See Hughes v. Northwestern University*, 142 S. Ct.

737, 742 (2022) (instructing the Seventh Circuit to apply those pleading standards on remand).

Accordingly, an ERISA plaintiff is not "require[ed] . . . 'to rule out every possible lawful

explanation for the conduct he challenges.'" *Sacerdote v. New York Univ.*, 9 F.4th 95, 108 (2d

Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022).

Courts analyzing ERISA fiduciary duty claims are required to conduct a "context-specific

inquiry." *Hughes*, 142 S. Ct. at 740 (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)).

With respect to the fiduciary duty of prudence, fiduciaries' actions are evaluated "based upon

information available to the fiduciary at the time of each investment decision and not from the

vantage point of hindsight." *PBGC*, 712 F.3d at 716 (citation omitted). The emphasis is on

whether the "fiduciary's process" was prudent and not on whether the "outcome" was. *Ferguson

v. Ruane Cunniff & Goldfarb Inc*., 2019 WL 4466714, at *5 (S.D.N.Y. Sep. 18, 2019). "To that

end, a plan fiduciary's duty of prudence incorporates an ongoing duty to monitor the prudence of

investment options and recordkeeping fees." *Carrigan v. Xerox Corp*., 2022 WL 1137230, at *5

(D. Conn. Apr. 18, 2022).

### 1. *Underperformance*

The plaintiffs argue that Stanley Black & Decker breached its duty of prudence by failing

to respond to the underperformance of the BlackRock TDFs, the Plan's QDIA and the index in

which 39% of the Plan is invested. Doc. No. 85 at ¶¶ 72-73. Stanley Black & Decker moves to

dismiss the plaintiffs' underperformance claim for failure to state a claim. Stanley Black &

Decker sets forth three arguments: (1) the plaintiffs' benchmarks are not meaningful, (2) the

plaintiffs' underperformance data is "intermittent" and "negligible," and (3) the plaintiffs' claims

regarding the defendant's allegedly deficient process are conclusory. *See generally* Doc. No. 96.

"Trust law informs the duty of prudence, because 'an ERISA fiduciary's duty is derived from the common law of trusts.'" *Singh*, 650 F. Supp. 3d at 266 (quoting *Tibble*, 575 U.S. at 528). The Supreme Court has stated that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 575 U.S. at 529. Therefore, "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If "fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes*, 142 S. Ct. at 742. The Second Circuit has also explained that an ERISA complaint may survive a motion to dismiss if it "allege[s] facts sufficient to raise a plausible inference that the investments at issue were so plainly risky at the relevant times that an adequate investigation would have revealed their imprudence, or that a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative." *PBGC*, 712 F.3d at 719.

a.   Adequacy of Benchmarks for Underperformance Claim

Stanley Black & Decker contends that the plaintiffs' comparators are not meaningful benchmarks. Doc. No. 96 at 25. Some courts have dismissed ERISA underperformance claims at the pleading stage when plaintiffs made "conclusory assertions" of similarity between the plan at issue and the comparators that were unsupported by the facts in the complaint. *See Patterson*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019); *see also Anderson v. Advance Publications, Inc.*, 2023 WL 3976411, at *3-*4 (S.D.N.Y. June 13, 2023).

It is, however, "the overwhelming trend with district courts in this Circuit . . . to defer deciding the question of whether two funds are proper comparators until after discovery." *In re*

*Omnicom ERISA Litig.*, 2021 WL 3292487, at *13 (S.D.N.Y. Aug. 2, 2021) (collecting cases); *see also* Doc. No. 81-3 at 5 (*Mattson v. Milliman, Inc.*, Dkt. No. 2:22-cv-00037-TSZ, slip op. (W.D. Wash. Dec. 13, 2022)) (minute order) (declining to make factual determination that comparator funds were materially different because "[t]he Court must strike an appropriate balance by requiring plaintiff to offer enough factual material to establish that she is not engaged in a mere fishing expedition, while not demanding of her information that 'tend[s] systematically to be in the sole possession of defendants.'"). In cases where courts have deferred the comparator question until after discovery, the courts did so because the question of whether the comparators were proper "raise[d] factual questions that are not properly addressed on a motion to dismiss." *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017); *see also* *Sacerdote v. N.Y. Univ.*, 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017).

      i.  <u>Comparator TDFs</u>

      Here, the plaintiffs have plausibly alleged that their comparator TDFs are the only viable alternative TDFs in which the Plan could have invested. As they aver, the BlackRock TDF is one of the top six largest TDF series, and those six "manage[] approximately three-quarters of all TDF assets." Doc. No. 85 at ¶ 105. Those six TDFs are Vanguard Target Retirement, T. Rowe Price Retirement, BlackRock LifePath Index, American Funds Target Date Retirement, Fidelity Freedom, and Fidelity Freedom Index. *See* Doc. No. 85 at 40 ¶ 106. BlackRock is the third largest TDF series. The plaintiffs isolate four of the other five TDF series comprising that group of six and present them as comparators.[5] *Id*. at ¶ 106. If the plaintiffs were to present any other,

---

[5] The plaintiffs contend that the Fidelity Freedom Funds are not appropriate comparators because, "after undergoing a strategy overhaul in 2014," the Fidelity Freedom Funds "lost considerable assets and market share." Doc. No. 84 at 40 n.22. Still, the plaintiffs allege, the Fidelity Freedom Funds "outperformed the BlackRock TDFs during the Class Period." *Id*.

smaller TDFs as comparators, those TDFs would be inapt comparators because they would not be possible investment alternatives for the Plan. *See id*. at ¶ 105.

The plaintiffs additionally support their choice of comparators by contending that the Wilshire Reports, the reports that the Committee relied on when evaluating the BlackRock TDFs' performance, used some of the same comparators. *Id.* at ¶¶ 82, 83-99; *see, e.g.*, Doc. No. 106-1 at 3 (Wilshire Report from September 30, 2016 evaluating the BlackRock TDFs and listing American Century, BlackRock, Fidelity, JPMorgan, Manning & Napier, MFS, Principal, T Rowe Price, TIAA-CREF, and Voya as the "Target Date Fund – Peer Universe").

Finally, the plaintiffs also plausibly allege that, with respect to the risk discrepancy between "to" and "through" glidepath TDFs, the "equity allocation discrepancy" for "to" glidepaths like the BlackRock TDFs "is only reflected in . . . [the] most conservative vintages, the 2025 and Retirement TDFs." Doc. No. 85 at ¶ 109; *see also id.* at 42 ¶ 109 (table comparing TDFs' percent of portfolio in equities across vintages); *id.* at 43 ¶ 110 (graph comparing the glide paths of TDFs).

Considering their allegations in totality, the plaintiffs have plausibly alleged the adequacy of their comparators sufficient for this stage of the litigation. *Accord Trauernicht v. Genworth Fin. Inc.*, 2023 WL 5961651, at *13 (E.D. Va. Sept. 13, 2023).

### ii.  Sharpe Ratio and S&P Target Date Indices

As additional benchmarks to measure the BlackRock TDFs' performance, the plaintiffs also rely on the Sharpe Ratio and the S&P Target Date Indices. Per the plaintiffs, "[t]he Sharpe ratio metric, a common component of a fiduciary investment monitoring, accounts for differing levels of risk by measuring the performance of an investment, such as a TDF, compared to the performance of similar investments, after adjusting for risk." Doc. No. 85 at ¶ 112.

Stanley Black & Decker challenges the plaintiffs' use of the Sharpe ratio, contending that it "cannot substitute making two funds comparable in the first place." Doc. No. 96 at 29 (quoting *Hall v. Cap. One Fin. Corp.*, 2023 WL 2333304, at *7 (E.D. Va. Mar. 1, 2023); *Tullgren v. Hamilton*, 2023 WL 2307615, at *7 (E.D. Va. Mar. 1, 2023)). Because the Sharpe ratio is not itself a TDF, it may not be the best benchmark for measuring the BlackRock TDFs' relative performance. *See Hall*, 2023 WL 2333304, at *7 (holding that Sharpe ratio cannot substitute for adequate comparators). Nevertheless, the determination of whether the Sharpe ratio is an appropriate benchmark is a fact issue that is not properly determined at this stage of the case. *See Trauernicht*, 2023 WL 5961651, at *13 (holding the same). Because the plaintiffs have alleged facts suggesting that the Sharpe ratio is an adequate measurement tool, and because the Sharpe ratio is not the *only* benchmark that the plaintiffs rely on, I defer the issue of its appropriateness as a benchmark to a later stage of the case.

The plaintiffs also include the S&P Target Date Indices as an additional comparator to measure the BlackRock TDFs' performance, the appropriateness of which Stanley Black & challenges. *See* Doc. No. 96 at 28. Some courts within this Circuit have held that "a plaintiff may allege a breach of fiduciary duty based on a fund's underperformance relative to a benchmark index." *Ruilova v. Yale-New Haven Hosp., Inc.*, 2023 WL 2301962, at *15 (D. Conn. Mar. 1, 2023) (quoting *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 163 (E.D.N.Y. 2022)). Furthermore, when presented in combination with their allegations regarding peer TDFs, the S&P Target Date Indices assist the plaintiffs in plausibly showing that their peer TDF performance comparisons are not cherry picked.

Accordingly, the plaintiffs' allegations regarding their comparators are sufficient at the pleading stage to support their underperformance claim.

b. Underperformance Data

In addition to arguing that the plaintiffs' comparators are not meaningful benchmarks, Stanley Black & Decker also contends that the plaintiffs' underperformance data does not support their imprudence claim. To raise an inference of imprudence, the plaintiffs' underperformance data must show "consistent" and "substantial" underperformance. *See Gonzalez*, 632 F. Supp. 3d at 163 (quoting *Patterson*, 2019 WL 4934834, at *10). Stanley Black & Decker argues that the plaintiffs' performance data is "insubstantial" and "short-term." Doc. No. 96 at 19, 23-24.

When considering whether a fund's underperformance is substantial enough to show fiduciary imprudence, courts typically look at the returns of the fund and its benchmark or comparator funds. Courts have considered underperformance between 1-3% to be insufficient alone to support a claim of imprudence. *See Ruilova*, 2023 WL 2301962, at *15 (underperformance by 1%, 1.10%, 1.52%, 1.12%, and 3.36% below the benchmark at various intervals insufficient); *Gonzalez*, 632 F. Supp. 3d at 164 (underperformance by 2.33% on a three-year rolling and 2.57% on a five-year rolling basis insufficient); *Patterson*, 2019 WL 4934834, at *11 (where "annual return over five years" underperformed by 1.14% "compared to the benchmark," the disparity was "certainly not enough to support a claim for breach of the duty of prudence."); *Bekker v. Neuberger Berman Group LLC*, 2018 WL 4636841, at *2, *7 (S.D.N.Y. Sept. 27, 2018) (ten-year annualized underperformance of 4.45% insufficient); *Cho v. Prudential Ins. Co. of Am.*, 2021 WL 4438186, at *9 (D.N.J. Sept. 27, 2021) (holding insufficient "five-year trailing performance had underperformance percentages ranging from .07% to 3.71%," and "ten-year trailing performance reflected underperformance ranging from 1.19% to 2.86%"). *But see Falberg*, 2020 WL 3893285, at *3, *10 (ten-year underperformance of "more than 1.00%" for some funds and "over 2.00%" for others was sufficient where the "plaintiff alleged several other

indicia of imprudence"). *Cf. Jacobs*, 2017 WL 8809714, at *9 (ten-year average annual underperformance of 8.63% sufficient).

Regarding the duration and consistency of underperformance, under the prevailing caselaw, a ten-year period of consistent underperformance is sufficiently lengthy to support an imprudence claim. *See Ruilova*, 2023 WL 2301962, at *14 ("In this Circuit, allegations of consistent, ten-year underperformance may support a duty of prudence claim, if the underperformance is substantial. In contrast, allegations based on five-year returns are not sufficiently long-term to state a plausible claim of imprudence.") (cleaned up and internal citations omitted).

The plaintiffs' summary charts present data showing relatively consistent underperformance from 2011 through at least 2021. *See* Doc. No. 85 at 58, 60-67. The plaintiffs display that underperformance through several comparisons: comparing the returns of the BlackRock TDFs to the returns of the plaintiffs' five comparator TDFs at a vintage- and suite-level, comparing the returns of the BlackRock TDFs to the S&P TDF Index returns, and comparing the BlackRock TDFs' Sharpe Ratio to that of the plaintiffs' comparators. *See id.* at 47-56, 58, 60-67. In their performance comparisons, the plaintiffs compare the three-year and five-year returns across each vintage for each quarter between the second quarter of 2016 and the second quarter of 2022. *See id.* at 48-56, 58, 60-67. Because the BlackRock TDFs underperformed on a relatively consistent basis across all those metrics until at least 2021, and the plaintiffs' data captures ten years of performance, the plaintiffs' underperformance data is sufficiently lengthy and consistent.

Whether the BlackRock TDFs' underperformance is sufficiently substantial, however, is a closer call. Despite the copious data presented by the plaintiffs, the Court counts just eleven

instances where the BlackRock TDFs underperformed the best performing comparator TDF by 3% or more: the 5-year return as of 3Q16 for the 2025 vintage; the 5-year return as of 4Q16 for the 2025 vintage; the 5-year return as of 1Q17 for the 2030 vintage; the 5-year return as of 2Q17 for the 2025, 2030, and 2035 vintages; the 5-year return as of 3Q17 for the 2025, 2030, and 2035 vintages; the 5-year return as of 4Q17 for the 2035 vintage; and the 5-year return as of 1Q18 for the 2035 vintage. *See id.* at 50-56. Comparing the BlackRock TDFs' returns to the median of the comparators would produce an even smaller discrepancy. Furthermore, even though the BlackRock TDFs underperform relative to the S&P TDF Index on a consistent basis until 2019, that underperformance never appears to be greater than 1.46%. *Id.* The plaintiffs do, however, show that the BlackRock TDFs cumulatively underperformed all four of the other comparator TDFs in the relevant timeframe. *See* Doc. No. 85 at 59 ¶ 120. In particular, the BlackRock TDFs cumulatively underperformed the American Funds TDF on a Plan-asset weighted basis by 11.90% and the T. Rowe Price TDF by 9.08%. *Id.*

Underperformance to the degree shown above is not necessarily substantial enough to render the fiduciaries' retention of the BlackRock TDFs *per se* imprudent. A "fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *White v. Chevron Corp.*, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016). The plaintiffs have therefore not alleged underperformance that is substantial enough alone to support the inference that the fiduciaries were imprudent in retaining the funds. That is not to say, however, that the plaintiffs' imprudence claim necessarily fails on that basis. Because the plaintiffs have alleged underperformance that is consistently observable across both metrics and time, the plaintiffs have plausibly alleged that the BlackRock TDFs' underperformance should have at the very least captured the attention of a prudent fiduciary.

c. Committee Minutes and Wilshire Reports

Because the BlackRock TDFs' underperformance is not substantial enough to prop up the plaintiffs' imprudence claim alone, the plaintiffs' process allegations are critical to whether they have nudged their underperformance claim to plausibility. Stanley Black & Decker challenges the plaintiffs' process allegations, which rely in part on the Committee's minutes and its review of the Wilshire Reports. Doc. No. 96 at 29-31.

As previously discussed, the Wilshire Reports and the Committee's minutes may be either incorporated into the plaintiffs' amended complaint by reference or considered integral to the complaint. *See supra* Section III.A. The Court, however, does not have access to the minutes or the Wilshire Reports beyond the incomplete exhibits submitted by Stanley Black & Decker. *See* Docs. No. 90, 94, 106-1-106-19. Furthermore, even if I were to consider those exhibits, that does not transform this motion into an evidentiary motion or into a motion for summary judgment. At the motion to dismiss stage, I must "draw all reasonable inferences in favor of the plaintiffs" and merely determine whether the plaintiffs have pled a "plausible" claim for relief. *Zuro*, 432 F. Supp. 3d at 121.

I will thus consider the excerpts of the Wilshire Reports and the minutes that were attached as exhibits by Stanley Black & Decker. Further, I will construe the information in those documents in the light most favorable to the plaintiffs, in the same manner in which I construe the allegations in the plaintiffs' amended complaint. The conclusions I draw should not be misconstrued as findings of fact, but instead merely as determinations regarding whether the plaintiffs have pled a plausible imprudence claim based on underperformance.[6]

---

[6] The exhibits containing the excerpts of the Wilshire Reports and the Minutes have been filed under seal as "Designated Material" pursuant to the Standing Protective Order issued by this Court. *See* Doc. No. 4 (Standing Protective Order); Doc. No. 88 (motion to seal); Doc. No. 103 (motion to seal); Doc. No. 108 (granting motion to seal); Doc. No. 107 (same). Nevertheless, this opinion references and quotes from those excerpts. Court opinions

The documents Stanley Black & Decker filed as exhibits include:

| Document | Citation |
| --- | --- |
| Wilshire Report Excerpt, September 30, 2016 | Ex. 30, Doc. No. 106-1 |
| Minutes, March 27, 2017 | Ex. 29, Doc. No. 94 at 6 |
| Wilshire Report Excerpt, December 31, 2016 | Ex. 29, Doc. No. 94 at 10 |
| Minutes, June 27, 2017 | Ex. 31, Doc. No. 160-2 at 4 |
| Wilshire Report Excerpt, March 31, 2017 | Ex. 31, Doc. No. 160-2 at 7 |
| Minutes, October 2, 2017 | Ex. 32, Doc. No. 160-3 at 4 |
| Wilshire Report Excerpt, June 30, 2017 | Ex. 32, Doc. No. 160-3 at 6 |
| Minutes, January 12, 2018 | Ex. 33, Doc. No. 160-4 at 4 |
| Wilshire Report Excerpt, September 30, 2017 | Ex. 33, Doc. No. 160-4 at 6 |
| Minutes, March 26, 2018 | Ex. 34, Doc. No. 160-5 at 4 |
| Wilshire Report Excerpt, December 31, 2017 | Ex. 34, Doc. No. 160-5 at 6 |
| Minutes, July 10, 2018 | Ex. 35, Doc. No. 160-6 at 4 |
| Wilshire Report Excerpt, March 31, 2018 | Ex. 35, Doc. No. 160-6 at 6 |
| Minutes, December 5, 2018 | Ex. 36, Doc. No. 160-7 at 4 |
| Wilshire Report Excerpt, June 30, 2018 | Ex. 36, Doc. No. 160-7 at 6 |
| Wilshire Report Excerpt, September 30, 2018 | Ex. 36, Doc. No. 160-7 at 18 |
| Minutes, April 10, 2019 | Ex. 37, Doc. No. 160-8 at 4 |
| Wilshire Report Excerpt, December 31, 2018 | Ex. 37, Doc. No. 160-8 at 6 |
| Minutes, June 13, 2019 | Ex. 38, Doc. No. 160-9 at 4; Ex. 10, Doc. No. 90 at 2 |
| Wilshire Report Excerpt, March 31, 2019 | Ex. 38, Doc. No. 160-9 at 6 |
| Minutes, September 17, 2019 | Ex. 39, Doc. No. 160-10 at 4 |
| Wilshire Report Excerpt, June 30, 2019 | Ex. 39, Doc. No. 160-10 at 6 |
| Minutes, December 18, 2019 | Ex. 40, Doc. No. 160-11 at 4 |
| Wilshire Report Excerpt, September 30, 2019 | Ex. 40, Doc. No. 160-11 at 6 |
| Wilshire Report Excerpt, December 31, 2019 | Ex. 40, Doc. No. 160-11 at 28 |
| Minutes, September 24, 2020 | Ex. 41, Doc. No. 160-12 |
| Minutes, December 15, 2020 | Ex. 42, Doc. No. 160-13 |
| Minutes, March 25, 2021 | Ex. 43, Doc. No. 160-14 |
| Minutes, July 8, 2021 | Ex. 44, Doc. No. 160-15 |
| Minutes, September 20, 2021 | Ex. 45, Doc. No. 160-16 |
| Minutes, December 14, 2021 | Ex. 46, Doc. No. 160-17 |
| Minutes, March 31, 2022 | Ex. 47, Doc. No. 160-18 |
| Minutes, June 30, 2022 | Ex. 48, Doc. No. 160-19 |

"are 'judicial documents' to which the presumption of access applies." *Moroughan v. Cnty. of Suffolk*, 2021 WL 280053, at *2 (E.D.N.Y. Jan. 24, 2021) (collecting cases). I have considered the potential countervailing interests that could, hypothetically, overcome the presumption of access, and I conclude that none outweighs the public's interest in accessing this opinion and understanding the basis for my ruling. *See E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (citing *United States v. Hubbard*, 650 F.2d 293, 317-22 (D.C. Cir. 1980)). Accordingly, to the extent that portions of the Wilshire Reports and Minutes are referenced in this opinion, those portions are unsealed; the exhibits, however, will otherwise remain sealed on the docket. *Accord Spinelli v. Nat'l Football League*, 903 F.3d 185, 193 n.2 (2d Cir. 2018).

First, the parties dispute whether the Wilshire Reports show that the Plan often ranked last in performance among its peers. In their amended complaint, the plaintiffs allege that the Wilshire Reports contained a "peer-relative" analysis of the BlackRock TDFs' returns "ranked from 1 (best) to 100 (worst)." Doc. No. 85 at ¶ 82. Stanley Black & Decker counters by stating that "nowhere in [the Committee] materials does it state that the peer analysis provided a ranking." Doc. No. 96 at 31. The excerpted Wilshire Reports attached by Stanley Black & Decker consist only of charts and graphs, with little by way of explanation regarding what the charts and graph purport to show. As such, I will construe those charts and graphs in the light most favorable to the plaintiffs in order to determine whether the Wilshire Reports' peer analysis provided a ranking.

Considering, by way of example, the Wilshire Report excerpt from June 30, 2017, a summary chart (the "Chart") in that report shows each of the BlackRock TDF vintages and data regarding their respective quarterly, year-to-date, one-year, three-year, five-year, and ten-year returns. *See* Ex. 32, Doc. No. 106-3 at 8. For each column for those categories, the percentage return is listed, along with numerical indicators of "universe total" and "rank peer." *Id.* Below the Chart is a list of six TDFs under the heading "Target Date Peer Fund Universe." *Id.*

Focusing on, for example, the row of the Chart corresponding with the BlackRock TDF retirement vintage, the three-year return percentage is 3.1%, the universe total is 33, and the rank peer is 56. On another page of the Wilshire Report for June 30, 2017 is what appears to be a range bar graph (the "Bar Graph") with the heading "Performance Comparison vs Peer Universe." *Id.* at 9. That Bar Graph appears to show the range of returns among other funds in the "peer universe." *Id.* Under "3 years," the Bar Graph states that the BlackRock TDF retirement vintage has a 3.12% return, which corresponds with the number "33." *Id.* The Bar

Graph appears to show percentiles, according to a legend on the lefthand side, where a low percentile corresponds with a high percentage return. *Id*. The number "33" thus appears to mean 33rd percentile in returns among the "universe" of peer funds. The bottom of the Bar Graph shows that the Bar Graph compares the returns of between 278 and 372 funds.[7] *Id.*

Drawing reasonable inferences in the plaintiffs' favor, I interpret the Chart as follows. Both the numerical indicators for "universe total" and "rank peer" appear to be percentiles measuring returns from 1 (best) to 100 (worst). "Universe total" appears to be a comparison to the total universe of TDFs, which means up to hundreds of TDFs. "Rank peer," however, appears to be a percentile rank that compares only a sub-category of peer TDFs, specifically the six TDFs listed under the heading of "Target Date Peer Fund Universe." *Id*. I therefore conclude that the plaintiffs have plausibly pled that the Wilshire Report's "rank peer" number signifies how the BlackRock TDFs' returns compare to the six peer TDFs' returns, measured as a percentile, from 1 (best) to 100 (worst).

Having interpreted the meaning of the "rank peer," I next evaluate whether the excerpted Wilshire Reports show that the BlackRock TDFs were underperforming in a manner that should have invited action on the part of the fiduciaries. As I previously explained, the BlackRock TDFs' underperformance is not sufficiently substantial to make the Committee's retention of those TDFs *per se* imprudent. Construing the pleadings in the plaintiffs' favor, however, a prudent fiduciary would have at the very least scrutinized the consistency and duration of that underperformance.

First, in each of the Wilshire Reports, Wilshire gives the BlackRock TDFs a "Positive" view, regardless of the BlackRock TDFs relative underperformance. At this stage of this case,

---

[7] The reason for this range is likely the age of the funds. Younger funds may not have ten-year returns, so that is why there would only be 205 funds for which ten-year returns are captured, whereas there are far more funds for which the quarterly returns are captured.

that rating is not dispositive. A prudent fiduciary has a duty to monitor investments and not merely to rely on a consultant's one-word recommendation. Moreover, Wilshire also gave another fund, Dodge & Cox International Fund, a "Positive" view in the months prior to when the Committee decided to put that fund on a "watch list" and search for its replacement. *See* Ex. 40, Doc. No. 106-11 at 7, 29; Ex. 41, Doc. No. 106-12 at 2.

The BlackRock TDFs' peer ranks were noticeably and consistently poor between March 2017 and September 2018. *See* Exs. 31-36, Docs. No. 106-2-106-7. For example, in the Wilshire Report for December 31, 2017, the BlackRock TDFs' five-year returns were ranked between 78 and 100 for the 2055 through 2020 vintages—with the ranking at 100 for 2050, 2045, and 2040. Ex. 34, Doc. No. 106-5 at 8. The one-year returns were no better—the 2060 through 2030 vintages were ranked 89, and the 2020 vintage was ranked 78. *Id*. In the Wilshire Report for March 31, 2018, the quarterly returns and year-to-date returns were ranked at 100 for every single vintage. Ex. 35, Doc. No. 106-6 at 8. Poor ratings were also reflected for other returns and other vintages as well. *Id*. Setting aside the issue of whether a peer percentile rank is the ideal measure of a TDF's performance, the plaintiffs have plausibly alleged that the fiduciaries reviewed reports that emphasized the BlackRock's peer rank on a preliminary summary chart, and the BlackRock TDFs repeatedly ranked poorly on that metric. Prudent fiduciaries would have at the very least taken note of the repeatedly poor rankings.

The plaintiffs allege that "[t]here is no evidence that the Committee ever considered, discussed, or analyzed this comparative data." Doc. No. 85 at ¶ 81. Using the Committee's minutes as a reference, the plaintiffs allege that each time the Committee met quarterly to review performance data beginning from the third quarter in 2016 through the fourth quarter of 2018, the Committee did not discuss or mention the performance of the BlackRock TDFs. *Id*. at ¶¶ 83-

99. Stanley Black & Decker attaches several of the Committee's minutes and avers that those minutes show that the Committee did in fact review the performance of investment funds. Indeed, many—though not all—of those minutes do contain boilerplate language indicating that the Committee reviewed the Wilshire reports and the performance of the investments. Even though the minutes seem to indicate that the Wilshire reports were read and that the investments were generally evaluated, the minutes do not mention the BlackRock TDFs by name. *See, e.g.*, Ex. 31, Doc. No. 106-2 at 4 (minutes from June 27, 2017 stating that the Committee reviewed the Wilshire Report but not stating that the investments were generally reviewed for performance, or that the BlackRock TDFs were specifically reviewed); Ex. 32, Doc. No. 106-3 at 4 (minutes from October 2, 2017 stating that the Committee reviewed the Wilshire Report but not stating that the investments were generally reviewed for performance, or that the BlackRock TDFs were specifically reviewed); Ex. 33, Doc. No. 106-4 at 4 (minutes from January 12, 2018 stating that "[p]ursuant to its regular, quarterly monitoring of the investment funds that are offered under the Stanley Black & Decker Retirement Account Plan (the 'RAP'), the Committee, taking into account the attached, written report . . . from . . . Wilshire Associates, reviewed each such investment fund, other than the Stanley Black & Decker Stock Fund, with regard to various factors, including investment objectives, strategy, staffing, performance and fees."); Ex. 34, Doc. No. 106-5 at 5 (minutes from March 26, 2018 stating that "[t]he Committee reviewed each such investment fund with regard to various factors, including investment objectives, strategy, staffing, performance and fees. Taking into account the advice of Wilshire, as set forth in its report, the Committee concluded that, at this time, it was not necessary to make any changes in the investment funds that are currently being offered."); Ex. 35, Doc. No. 106-6 at 4 (minutes from July 10, 2018 stating, "[p]ursuant to its regular, quarterly monitoring of the investments . . .

taking into account the written report . . . from . . . Wilshire Associates . . . the Committee reviewed each such investment fund with regard to various factors, including investment objectives, strategy, staffing, performance and fees."); Ex. 36, Doc. No. 106-7 at 4 (minutes from December 5, 2018 stating "[p]ursuant to its regular, quarterly monitoring of the investments . . . taking into account the written reports . . . from . . . Wilshire Associates . . . the Committee reviewed each such investment fund with regard to various factors, including investment objectives, strategy, staffing, performance and fees.").

Meeting minutes should not necessarily be expected to contain "a verbatim transcript of all the issues considered by the fiduciaries." *Falberg v. Goldman Sachs Grp., Inc.*, 2022 WL 4280634, at *12 (S.D.N.Y. Sept. 14, 2022). At the same time, a fiduciary cannot absolutely shield itself from an accusation of imprudence by repeating in its minutes a generalized, boilerplate statement that it reviewed the performances of its investments. In this case, construing the minutes in the light most favorable to the plaintiffs, the omission of the BlackRock TDFs by name is conspicuous in light of the detail with which the Committee minutes describe other underperforming plans.

In particular, multiple Committee minutes discuss the Dodge & Cox funds by name, in addition to the generic language in those minutes regarding the Committee's review of its investments. For example, the April 10, 2019 minutes contain familiar language generally stating, *inter alia*, that "the Committee reviewed the investment managers and investment funds that are utilized under the Pension Plans with regard to various factors, including investment objectives, strategy, staffing, performance and fees." Ex. 37, Doc. No. 106-8 at 4. In addition to that generic paragraph, however, the minutes also later state that the Committee heard about the "investment approach and performance of Dodge & Cox," and that "the Committee agreed . . . to

refresh the active vs. passive management study for International Investments and review Wilshire's evaluation of Dodge & Cox's investment strategy and universe comparison." *Id*. at 5. The June 13, 2019 minutes similarly contain a nonspecific paragraph about the Committee's review of its Pension Plan investments, along with a more detailed paragraph regarding the Committee's review of the Dodge & Cox fund. Ex. 38, Doc. No. 106-9 at 4-5. According to those June 13, 2019 minutes, the Committee concluded that it would retain the Dodge & Cox investments after its review. *Id*. On September 24, 2020, the Committee minutes stated that the Committee had placed the Dodge & Cox Global Equity Fund on a "watch list" while searching for a replacement for that fund. Ex. 41, Doc No. 106-12 at 2. Accordingly, because the Committee minutes contain more detailed language when other underperforming funds are assessed, construing the minutes in the plaintiffs' favor, it is reasonable to infer that the Committee minutes omitted mention of the BlackRock TDFs because the Committee in fact did not scrutinize the underperformance of those funds. *Cf. Bracalente v. Cisco Sys., Inc*., 2024 WL 2274523, at *10 (N.D. Cal. May 20, 2024) (concluding that Committee's minutes did not support fiduciary duty claim in part because one month's minutes showed that the Committee specifically reviewed the BlackRock TDFs).

Moreover, the fact that the Committee here had a category, a "watch list," for underperforming funds that were scrutinized and for which replacements were considered further supports the plaintiffs' claim. As previously mentioned, a prudent fiduciary may ultimately decide to retain a fund that is underperforming for a period of several years—but presumably that prudent fiduciary would vigilantly monitor that underperforming fund before deciding to retain it. *See Gonzalez*, 632 F. Supp. 3d at 162. The BlackRock TDFs were never placed on a "watch list," nor do the minutes reflect discussion regarding whether to place them on such a list.

Thus, the minutes here, construed in the light most favorable to the plaintiffs, do not evince such vigilance on the part of the fiduciaries.

Stanley Black & Decker argues that the plaintiffs have "cherry-pick[ed] their way into an inference of imprudence." Doc. No. 96 at 31. In particular, the plaintiffs have focused on the BlackRock TDFs' poor performance under the peer rank metric, while ignoring that the "performance comparison v. peer universe" graphs for each vintage do not show consistent underperformance. *Id*. In effect, Stanley Black & Decker asks the Court to draw the inference that the fiduciaries only ignored the BlackRock TDFs' poor performance in the peer rank because they determined that the "performance comparison v. peer universe" metric was a sufficient measure of performance. But given the dearth of language in the minutes discussing the BlackRock TDFs altogether, drawing that inference would mean construing the Wilshire Reports and minutes in Stanley Black & Decker's favor. That I cannot do in this procedural posture.

Thus, for the foregoing reasons, I conclude that the plaintiffs have plausibly pled an imprudence claim based on the underperformance of the BlackRock TDFs.

### 2.   *Recordkeeping and Administrative Fees*

The plaintiffs further claim that Stanley Black & Decker breached its duty of prudence by allowing Plan participants to be overcharged for recordkeeping and administrative ("RK&A") fees. Stanley Black & Decker seeks to dismiss the plaintiffs' excessive RK&A fees claim. *See* Doc. No. 96 at 31.

"ERISA fiduciary duties are derived from the common law of trusts," and "pursuant to the Restatement (Third) of Trusts, a trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Tibble v. Edison Int'l*, 843

F.3d 1187, 1197-98 (9th Cir. 2016) (quoting Restatement (Third) of Trusts §§ 88, 90(c)(3)).

"Courts have found that fiduciaries can breach their duty of prudence by failing diligently to

investigate and monitor recordkeeping expenses." *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189,

213 (D. Mass. 2020) (collecting cases).

"[C]ourts have held that 'a plaintiff must plead administrative fees that are excessive in

relation to the *specific* services the recordkeeper provided to the *specific* plan at issue.'"

*Cunningham v. USI Ins. Servs., LLC*, 2022 WL 889164, at *4 (S.D.N.Y. Mar. 25, 2022)

(collecting cases); *see also Singh*, 650 F. Supp. 3d at 266-67 ("[T]he plaintiffs must allege more

than just that the 401(k) Plan's recordkeeping fees were higher than those of other plans. Well-

reasoned decisions in this Circuit have found that plaintiffs must plausibly allege that 'the

administrative fees were excessive relative to the services rendered.'") (collecting cases).

The plaintiffs point to three signs that they allege show Stanley Black & Decker was

imprudent with respect to the RK&A fees: the Plan charged higher RK&A fees per participant

than other similarly sized plans; the Plan's per-participant RK&A fees did not reduce as the Plan

grew; the Plan did not conduct competitive bidding during the class period; and the Plan used a

flawed method to measure RK&A fees.

Stanley Black & Decker argues that the plaintiffs have not plausibly alleged that the "fees

were excessive compared to the fees for specific services paid by the comparator plans," the

comparator plans are "meaningless benchmarks," and the "possibility" that Stanley Black &

Decker "did not conduct an RFP" does not raise the inference of imprudence. Doc. No. 96 at 32,

35, 39 (cleaned up).

a.   RK&A Fees Compared to Other Plans

Stanley Black & Decker argues that the plaintiffs have not sufficiently alleged that the recordkeeping fees were excessive. Doc. No. 96 at 32.

Courts have denied motions to dismiss excessive RK&A fees claims where plaintiffs have alleged plausible facts supporting the inference that "the plan failed to use its size and presumed negotiating power to reduce costs." *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *5 (citing *In re Quest Diagnostics Inc. ERISA Litig.*, 2021 WL 1783274, at *4 (D.N.J. May 4, 2021); *see, e.g.*, *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 685 (D. Conn. 2018).

Here, based on Plan participants' account statements and the Plan's Form 5500s, the plaintiffs allege that Plan participants were assessed a $12.25 quarterly recordkeeping fee, amounting to $49 annually per participant. Doc. No. 85 at ¶ 55. To determine what "the Plan ultimately paid to Wells Fargo in RK&A fees," the plaintiffs relied on the Plan's Form 5500s to calculate the number of participant accounts with a balance and the amount of direct compensation to Wells Fargo. *Id*. Based on those numbers, the plaintiffs determined that the Wells Fargo RK&A fee was $50 per plan participant in 2016, $48 in 2017, $50 in 2018, $49 in 2019, $51 in 2020, and, on average, $50. *Id*.

The plaintiffs compared those numbers to numbers derived from participant fee disclosures and Form 5500s for the comparators. Doc. No. 85 at ¶ 60. In their amended complaint, the plaintiffs identified 31 defined-contribution plans as comparators—adding to the seven comparators listed in their first complaint. *Id.* at 20 ¶ 58. *Cf.* Doc. No. 1 at 18 ¶ 55. The plaintiffs allege that all 31 plans "received at least the same RK&A services as the Plan." Doc. No. 85 at ¶ 61. The Plan has 19,253 participants, and the 31 comparators proposed by the plaintiffs have between 5,235 and 47,358 participants. *Id.* at 20 ¶ 58. Stanley Black & Decker challenges the suitability of those proposed comparator plans. Doc. No. 96 at 32-38.

i. <u>Size of the Proposed Comparators</u>

Turning first to the issue of the size of the comparator plans, because the 31 plans vary in size to a significant degree, not all of them qualify as comparators for the Plan. *Cf. Baker v. Univ. of Vermont Med. Ctr.*, Inc., No. 2:23-cv-00087-gwc, ECF No. 46 (D. Vt. Jan. 30, 2024), *available at* Doc. No. 109-1 (comparators for excessive fees claim sufficient for pleading stage because they were similar in size to the challenged plan). The plaintiffs' allegations of RK&A fees for 31 plans nevertheless strengthen their allegations in two ways: (1) the allegations support their claim that plan size is highly correlated with per-participant fees, and by extension that larger plans should have smaller per-participant fees; and (2) the allegations help the plaintiffs defend against the counterargument that they have cherry picked only a handful of convenient comparators. Indeed, the plaintiffs' list of 31 plans shows a clear, inverse correlation between the size of a plan and per-participant RK&A fees charged, and almost all the plans similar in size to the Plan paid significantly lower fees per participant than the Plan did. Doc. No. 85 at 20 ¶ 58; see also *id*. at 21 ¶ 59.

Given that the plaintiffs have shown that plan size is a substantial factor in per-participant RK&A fees, I will consider only the plans that are similar in size to the Plan to be possible comparators. The Plan has 19,253 participants. *Id*. at 19 ¶ 55. Of the 31 plans listed by the plaintiffs, 8 of them have between 14,000 and 26,000 participants: DHL Retirement Savings Plan, Michelin 401(k) Savings Plan, Ecolab Savings Plan and ESOP, Qualcomm Inc. Employee Savings & Retirement Plan, MassMutual Thrift Plan, The Rite Aid 401(k) Plan, Sanofi U.S. Group Savings Plan, and Dollar General Corp 401(k) Savings and Retirement Plan. *See id*. at 20 ¶ 58. The plans and their participant numbers are displayed in the table below.

| Plan | Number of Participants[8] |
|------|---------------------------|
| DHL Retirement Savings Plan | 14,472 |
| Michelin 401(k) Savings Plan | 15,880 |
| Ecolab Savings Plan and ESOP | 17,886 |
| **Stanley Black & Decker Retirement Account Plan** | Average: 19,253<br><br>2016: 16,631<br><br>2020: 20,603 |
| Qualcomm Incorporated Employee Savings and Retirement Plan | 20,955 |
| MassMutual Thrift Plan | 23,131 |
| The Rite Aid 401(k) Plan | 24,309 |
| Sanofi U.S. Group Savings Plan | 25,086 |
| Dollar General Corp 401(k) Savings and Retirement Plan | 25,614 |

ii.   Services Provided to the Proposed Comparators

Turning next to the issue of the services provided to the comparators, plaintiffs who base an excessive fees claim on a comparison to comparators must plausibly allege that the comparators received similar services. In *Singh*, the court held that a plaintiff's general allegation that "nearly all recordkeepers in the marketplace offer the same range of services" was insufficient. *Singh*, 650 F. Supp. 3d at 267 (cleaned up). The *Singh* court wrote that "[t]he plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range." *Id*; *see also Young v. GM Inv. Mgmt. Corp*., 325 F. App'x 31, 33 (2d Cir. 2009) (holding that plaintiffs did allege breach of fiduciary duties where they "fail[ed] to allege that the fees were excessive relative 'to the services rendered'"); *Mateya v. Cook Grp. Inc*., 2023 WL 4608536, at *3 (S.D. Ind. June 16, 2023) (holding that plaintiff's general allegations that all plans "purchased the same recordkeeping services" and "virtually every major recordkeeper

---

[8] Numbers derived from the plaintiffs' amended complaint. *See id.* at 19 ¶ 55, 20 ¶ 58.

provide[s] the same core services[s]" were insufficient). Similarly, in *Cunningham*, the court dismissed a plaintiff's claim because the plaintiff's general allegations that the comparators offered similar services were not supported by the service codes in the Form 5500s. *Cunningham v. USI Ins. Servs., LLC*, 2022 WL 889164, at *4. Still, *Cunningham* emphasized that "the pleading standard . . . does not require Plaintiff to plead only those retirement savings plans reporting *wholly identical* service codes in the Form 5500 filings. But at the very least, Plaintiff must plead those retirement savings plans that provide the same 'basket of services' for her excessive fee claim to be viable." *Id*.

Here, the plaintiffs allege that "an overall suite of recordkeeping services is provided to large plans as part of a 'bundled' arrangement for a buffet style level of service, meaning that the services are provided, in retirement industry parlance, on an 'all-you-can-eat' basis." Doc. No. 85 at ¶ 35. "These services," they explain, "include but are not limited to . . . recordkeeping; transaction processing . . .; administrative services related to converting a plan from one recordkeeper to another; participant communications . . .; maintenance of an employer stock fund . . .; plan document services . . .; plan consulting services . . .; accounting and audit services . . .; compliance support . . .; and compliance testing." *Id*. (cleaned up). "This suite of essential RK&A services . . . are offered by all recordkeepers for one price (typically at a *per capita* rate), regardless of the services chosen or utilized by the plan." *Id*. at ¶ 36.

The plaintiffs further emphasize that "the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Any claim that recordkeeping expenses depend upon the level of services provided to a plan is both false and frivolous." *Id*. Distinct from those "Bundled RK&A" services are what the plaintiffs call "A La Carte RK&A services," which "often charge separate, additional fees based on the conduct and

use of individual participants." *Id.* at ¶ 37. The plaintiffs allege that for large contribution plans,

there is an "industry-wide practice of recordkeepers quoting fees for Bundled RK&A services on

a per-participant basis without regard for any individual differences in services requested." *Id.* at

¶ 39. That the services provided are "fungible" is a premise the plaintiffs argue is adopted by

Wilshire Associates, the Plan's investment consultant, which produced a report for the Plan that

"compared the Plan's recordkeeping fees to those of 'similar plans' from several broad

databases, without regard for, or even mention of, any differences in services received by any

comparator." *Id.* at ¶¶ 36, 39.

Furthermore, the plaintiffs clarify that "the average cost for a recordkeeper to provide

services to a participant does not hinge on that participant's account balance." *Id.* at ¶ 43. That is

because "Wells Fargo," the plaintiffs allege, "provides no services to the Plan and its participants

that are unusual or out of the ordinary." *Id.* at ¶ 52. They base that allegation on Wells Fargo's

disclosures, which they allege "list the services for which recordkeeping costs are charged to the

Plan." *Id.* at ¶ 53. The plaintiffs further allege that their comparators "received at least the same

RK&A services as the Plan." *Id.* at ¶ 61.

Examining the Form 5500s of the six proposed comparators that are similar in size to the

Plan,[9] the plans appear to have received the following services from their RK&A service

providers:

| Comparator Plan | Services Received According to the Form 5500 Service Codes |
|---|---|
| DHL Retirement Savings Plan | Participant loan processing; Recordkeeping fees; Account maintenance fees |

---

[9] In earlier briefing, the plaintiffs wrote that "[t]here are multiple ways to designate the same services on a Form 5500 and no penalties for incorrectly filling out a Form 5500. Therefore, the service codes listed on a Form 5500 are not a basis to resolve factual disputes regarding a plaintiff's allegations that a plan paid more than comparable plans for materially similar services." *See* Doc. No. 82 at 2 n.1.

| Michelin 401(k) Savings Plan | Recordkeeping and information management; Consulting (general); Trustee (directed); Participant loan processing; Investment management fees paid indirectly by plan |
|---|---|
| Ecolab Savings Plan and ESOP | Participant loan processing; Recordkeeping fees; Account maintenance fees |
| Stanley Black & Decker Retirement Account Plan | *2016:* Recordkeeping and information management; Participant loan processing; Direct payment from the plan; Float revenue; Distribution (12b-1 fees); Recordkeeping fees<br><br>*2017-2020:* Recordkeeping and information management; Participant loan processing; Direct payment from the plan; Float revenue; Recordkeeping fees |
| Qualcomm Incorporated Employee Savings and Retirement Plan | Participant loan processing; Sub-transfer agency fees; Recordkeeping fees; Account maintenance fees; Securities brokerage commissions and fees |
| MassMutual Thrift Plan | Not disclosed |
| The Rite Aid 401(k) Plan | Recordkeeping and information management; Direct payment from the plan; Recordkeeping fees |
| Sanofi U.S. Group Savings Plan | Recordkeeping and information management; Participant loan processing; Other services |
| Dollar General Corp 401(k) Savings and Retirement Plan | Participant loan processing; Recordkeeping fees; Other (specify); Other services |

The service codes on the Form 5500s for the Plan show that the Plan received relatively basic RK&A services from Wells Fargo for all relevant years—recordkeeping and information management and participant loan processing. By comparison, for example, Qualcomm Incorporated Employee Savings and Retirement Plan received additional securities brokerage services. In addition, Sanofi U.S. Group Savings Plan and Dollar General Corp 401(k) Savings and Retirement Plan received unspecified "other" services from their RK&A providers in addition to basic services. Thus, to the extent that the services that the comparator plans received differed from those the Plan, those differences are largely in the plaintiffs' favor. Showing that the comparator plans received *additional* services that the Plan did not, yet paid lower fees for

those services, supports the plaintiffs' argument that the Plan's fees were excessive in relation to the services rendered. Thus, reading the plaintiffs' allegations in their favor, the service codes on the Form 5500s support the plaintiffs' claim that the Plan does not offer out-of-the-ordinary services that could justify higher RK&A fees than the comparator plans. *Accord Mator v. Wesco Distribution, Inc.*, 2024 WL 2198120, at *3-*4, *7 (3d Cir. May 16, 2024).

The Court lacks information regarding services provided to MassMutual Thrift Plan, despite it being similar in size to the Plan. Even though the plaintiffs make generalized allegations regarding the types of services provided to all plans, the absence of publicly available information regarding the services received by the MassMutual Thrift Plan makes it a less apt comparator in this case than the other similarly sized plans. Accordingly, I will not consider MassMutual Thrift Plan to be a proper comparator in this case.

The plaintiffs have thus plausibly pled that at least seven of their proposed comparators are sufficiently analogous in size and in services received.

### iii.  Comparing RK&A Fees Across Plans

Having determined that the plaintiffs have alleged at least seven adequate comparators for their RK&A fees claim, I next turn to the issue whether the plaintiffs have plausibly alleged that the Plan paid more in fees than the comparators did. In a table in their amended complaint, the plaintiffs list the number of participants in each of their comparator plans, the total RK&A fee paid, the per-participant RK&A fee, and the recordkeeper. Doc. No. 85 at 20 ¶ 58. The plaintiffs aver that they derived their numbers from "publicly available data and information from participant fee disclosures and Form 5500 filings . . . during the Class Period." *Id*. at ¶ 57. The below table includes the seven comparator plans.

| Plan | Number of Participant[10] | Per-Participant RK&A Fee[11] | Whether the Service Provider Received Indirect Compensation[12] |
|---|---|---|---|
| DHL Retirement Savings Plan | 2018: 14,472<br><br>2020: 15,336 | 2018: $33<br><br>2020: $52 | 2018: Yes<br><br>2020: Yes |
| Michelin 401(k) Savings Plan | 15,880 | $34 | Yes |
| Ecolab Savings Plan and ESOP | 17,886 | $34 | No |
| **Stanley Black & Decker Retirement Account Plan** | Average: 19,253<br><br>2016: 16,631<br><br>2020: 20,603 | Average: $50<br><br>2016: $50<br><br>2020: $51 | 2016: Yes<br><br>2020: Yes |
| Qualcomm Inc. Employee Savings & Retirement Plan | 20,955 | $31 | Yes |
| The Rite Aid 401(k) Plan | 24,309 | $30 | No |
| Sanofi U.S. Group Savings Plan | 25,086 | $23 | Yes |
| Dollar General Corp 401(k) Savings and Retirement Plan | 25,614 | $35 | Yes |

As shown above, only one of the comparator plans, the DHL Retirement Savings Plan, had a similar per-participant fee in 2020 as the Plan did. In their amended complaint, the plaintiffs appear to derive the per-participant fee for the DHL Retirement Savings Plan from the 2018 Form 5500, even though they seemingly rely on the 2020 Form 5500s for the other comparator plans. The per-participant fee for the DHL Retirement Savings Plan in 2018 appears to be an outlier in its lower per-participant fee, however, compared to the higher fees paid by that

[10] All numbers derived from the plaintiffs' amended complaint, except for the 2020 number for DHL Retirement Savings Plan, which was derived from the plan's Form 5500.

[11] All numbers derived from the plaintiffs' amended complaint, except for the 2020 number for DHL Retirement Savings Plan, which were derived from the plan's Form 5500.

[12] Answers derived from the plans' Form 5500s for 2020. For the Stanley Black & Decker Retirement Account Plan, both the 2016 and 2020 Form 5500s were examined.

plan in other years between 2016 and 2022. Nevertheless, the fact that one other plan also paid unusually high RK&A fees per participant does not necessarily defeat the plaintiffs' RK&A fee claim.

The remaining six of the seven comparator plans had significantly lower per-participant RK&A fees than the Plan did. Some of the comparator plans, like the Plan, also reportedly issued indirect compensation to their service providers. For those plans that issued indirect compensation, the effective per-participant amount of indirect compensation is unknown.[13] "ERISA plans commonly pay recordkeeping fees through direct fees, indirect mechanisms like revenue sharing, or a direct/indirect payment combination." *Gonzalez*, 632 F. Supp. 3d at 166. "In a revenue sharing system, the recordkeeper retains some of the investment income of the retirement plan to satisfy the plan's administrative expenses." *Tracey v. Massachusetts Inst. Of Tech.*, 404 F. Supp. 3d 356, 362 (D. Mass. 2019). Plan participants pay service providers direct compensation through direct fees, and indirect compensation through loss of revenue and, by extension, loss of retirement income. *See Rosenkranz v. Altru Health Sys.*, 2021 WL 5868960, at *4 (D.N.D. Dec. 10, 2021). The amount of indirect compensation is therefore ultimately relevant to the determination of whether fees were excessive.

Because the amount of indirect compensation is not disclosed on the Form 5500s, that information is not publicly available. The Second Circuit has acknowledged that ERISA plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *PBGC*, 712 F.3d at 718 (citation omitted). Here,

---

[13] The plaintiffs claim that they accounted for indirect compensation in their calculations. They write that "if the pricing structure as described in the Form 5500 reveals that some or all revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RK&A fees. In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the RK&A fees." Doc. No. 85 at ¶ 60. Cross referencing the plaintiffs' numbers against the Form 5500s, however, it appears that in their Plan and comparator calculations, the plaintiffs rely only on the amount of direct compensation reported in the Form 5500s—they do not make any adjustments for the plans that also report indirect compensation.

although the plaintiffs have not *proven* their claim that the Plan's RK&A fees were excessive, they have nevertheless alleged enough to nudge that claim to plausibility. The plaintiffs plausibly allege that the Plan participants paid significantly more in direct compensation on a per-participant basis than most of the comparator plans did. In addition to paying more in direct compensation per participant than the comparator plans, the Plan is also paying an additional undisclosed amount of indirect compensation. Meanwhile, at least two of the comparator plans are paying lower per-participant direct fees *and* are not providing any indirect compensation.

The plaintiffs have thus plausibly pled a set of at least seven comparators for their RK&A fees claim, and their allegations regarding those comparators support the plaintiffs' claim that the Plan paid excessive RK&A fees.

### b.   Comparing RK&A Fees as the Plan Grew

The plaintiffs' claim of excessive RK&A fees is additionally plausible because the plaintiffs allege that the Plan's per-participant RK&A fees did not reduce as the Plan itself grew. The plaintiffs allege that "[a]s a plan's participant count increases, the recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis." Doc. No. 85 at ¶ 41. They allege that "it is axiomatic in the retirement plan services industry that, all else being equal: (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) as participant counts increase, the effective per-participant RK&A fee should decrease, assuming the same services are provided." *Id*. at ¶ 42. Moreover, as discussed previously, the plaintiffs' list of 31 peer plans with fees those plans paid further supports the plaintiffs' allegation that number of plan participants should inversely correlate with the per-participant fee rate. Doc. No. 85 at 20 ¶ 58; *see also id.* at 21 ¶ 59.

The plaintiffs allege that the Plan paid Wells Fargo in RK&A direct fees the same amount per participant in 2016, when the plan had 16,631 participants, as it paid per participant in 2018, when the plan had 19,469 participants. *Id*. at 19 ¶ 55. The Plan also paid Wells Fargo more in direct fees per participant in 2019, when it had 21,118 participants, than it did in 2017, when it had 18,445 participants. *Id.* In general, between 2016 and 2020, the Plan paid roughly the same amount in RK&A direct fees per participant despite the Plan's participant numbers fluctuating between 16,631 to 21,118 during that timeframe. *Id*. At the hearing on the motion to dismiss, Stanley Black & Decker claimed that the RK&A fee had declined in 2020 to $39 per participant. *See* Doc. No. 118 at 48. Even if that were the case, that would actually support the inference that in the years before 2020, the per-participant fees were too high in relation to the services rendered.

As was the case with their comparisons to peer plans, the plaintiffs, relying on the information in the Form 5500s, appear only able to show that the direct compensation to Wells Fargo did not fluctuate substantially. The service codes on the Form 5500s for the Stanley Black & Decker Retirement Plan reveal that Wells Fargo was also at least partially compensated through indirect compensation for all five years, but the amount of that compensation is unknown. Still, according to the Form 5500s for the Plan between 2016 and 2020, the Plan received virtually identical services all five years: Recordkeeping and information management; Participant loan processing; Direct payment from the plan; Float revenue; and Recordkeeping fees.[14] The plaintiffs have therefore plausibly alleged that Wells Fargo delivered substantially the same RK&A services for all five years. Accordingly, the plaintiffs have also plausibly pled that

---

[14] The only difference among those years is found in the Plan's 2016 Form 5500, which lists "Distribution (12b-1 fees)" as an additional expense.

the Plan did not leverage its increase in numbers from 2016 to 2019 to lower fee costs. *See* Doc. No. 85 at 19 ¶ 55.

      c.   Competitive Bidding

In further support of their RK&A fees claim, the plaintiffs allege that the defendant did not "conduct any competitive bidding, in the form of an RFP or otherwise, during the Class period." Doc. No. 85 at ¶ 64.

Stanley Black & Decker argues that a failure to conduct competitive bidding does not evince imprudence. *See* Doc. No. 96 at 39. In this circuit, although "competitive bidding is not <u>per se</u> required under ERISA, . . . there are circumstances where a failure to run a competitive bidding process may be imprudent." *Sacerdote*, 2017 WL 3701482, at *8 (S.D.N.Y. Aug. 25, 2017) (internal citations omitted), *aff'd in part, vacated in part on other grounds*, *Sacerdote*, 9 F.4th 95 (2d Cir. 2021). Other courts in this circuit have held similarly. *See Vellali v. Yale Univ.*, 2022 WL 13684612, at *9 ("While the defendants are correct that ERISA does not require competitive bidding, a fiduciary's failure to use reasonable means to determine whether administrative fees are reasonable, such as through a competitive bidding process, can constitute a breach of the duty of prudence."). *But see Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019) ("Defendants' alleged failure to seek competitive bids is 'merely consistent with a finding of [imprudence],' as opposed to being 'suggestive' of such a finding.") (quoting *PBGC*, 712 F.3d at 718-19).

A lack of competitive bidding is thus not a strong indicator of imprudence in this Circuit; however, when combined with other allegations, it can contribute to the plausibility of the plaintiffs' imprudence claim. Here, the plaintiffs have pled other allegations that make their excessive fees claim plausible.

d.   Plan's Measurement of RK&A Fees

The plaintiffs further allege that the Plan used a flawed RK&A services benchmarking study from Wilshire. Doc. No. 85 at ¶ 65. The study was flawed, they argue, because it "expressed the recordkeeping fees paid by similarly large plans as a percentage of total plan assets, as opposed to a dollars-per-participant figure." *Id*. at ¶ 66. Stanley Black & Decker challenges that argument, contending that the use of revenue sharing for recordkeeping services is recognized and not imprudent. *See* Doc. No. 96 at 40.

I construe the plaintiffs' amended complaint to argue not that revenue sharing was *per se* imprudent, but that not also monitoring RK&A compensation on a cost-per-participant basis is imprudent. Separately in their amended complaint, as discussed above, the plaintiffs plausibly allege that the greater the number of plan participants, the lower the per-participant RK&A fee should be. *See, e.g.*, Doc. No. 85 at ¶¶ 60-62. The Plan compensated its recordkeeper both directly and indirectly. *See* Doc. No. 38-10 at 7; Doc. No. 38-11 at 27. Construing the plaintiffs' allegations in their favor, if the Plan indeed only monitored the RK&A compensation as a percentage of Plan assets and did not monitor the RK&A fees per participant, that fact would support the plaintiffs' imprudence claim.

For the reasons discussed above, the plaintiffs have asserted a plausible ERISA claim of fiduciary imprudence based on RK&A fees.

3.   *Duty of Loyalty Claim*

In their briefs, the plaintiffs argue that Stanley Black & Decker also violated the ERISA fiduciary duty of loyalty, a claim that Stanley Black & Decker seeks to dismiss as improperly pled. *See* Doc. No. 96 at 42; Doc. No. 100 at 48-49.

Section 404(a) of ERISA states that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1) (cleaned up). In accordance with the duty of loyalty, "[a] fiduciary must always 'wear the fiduciary hat when making fiduciary decisions' even when that fiduciary represents a plan sponsor or those who provide services to the ERISA plan." *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 129 F. Supp. 3d 4, 12 (S.D.N.Y. 2015) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000)). "Breaches of the 'unwavering' duty of loyalty occur when a fiduciary deviates from that 'single-minded devotion,' placing its interests or the interests of a third party above that of plan participants or beneficiaries." *Vellali*, 308 F. Supp. 3d at 688 (citations omitted). "To state a claim for breach of loyalty, 'a plaintiff must allege facts that permit a plausible inference that the defendant "engag[ed] in transactions involving self-dealing or otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests."'" *Id*. (citations omitted). "[T]he duty of loyalty and the duty of prudence are interrelated and overlapping," and although the analysis of one "may inform the analysis" of the other, "the two remain conceptually distinct from one another." *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 129 F. Supp. 3d at 13, (internal citation omitted); *Vellali*, 308 F. Supp. 3d at 688.

The plaintiffs allege no facts that support the inference that a fiduciary engaged in "self-dealing" or that a fiduciary "deviate[d]" from their "single-minded devotion" to the Plan's participants and beneficiaries. *Vellali*, 308 F. Supp. 3d at 688 (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988)). The plaintiffs have therefore failed to plead a

plausible claim of breach of the fiduciary duty of loyalty. To the extent that the plaintiffs' allege that Stanley Black & Decker breached the fiduciary duty of loyalty, that claim is dismissed.

### D. Failure to Monitor Claim

In count II of their amended complaint, the plaintiffs also bring a claim of failure to monitor fiduciaries and co-fiduciary breaches. Doc. No. 85 at 74-76. The plaintiffs plead that count "[t]o the extent that fiduciary monitoring responsibilities of Stanley Black & Decker or the Committee was delegated." *Id.* at ¶ 156. Because I have permitted the plaintiffs' breach of the duty of prudence claim to proceed, dismissal of the failure to monitor claim would be premature at this stage. *See* Doc. No. 100 at 50. Accordingly, Stanley Black & Decker's request to dismiss the plaintiffs' failure to monitor claim is denied.

## IV. Conclusion

For the foregoing reasons, Stanley Black & Decker's motion to dismiss the amended complaint, doc. no 95, is **denied**.

To the extent that the plaintiffs' breach of fiduciary duty claim relies on the duty of loyalty, however, that claim is dismissed.

So ordered.

Dated at Bridgeport, Connecticut, this 3rd day of July 2024.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge